Kimberly B. **ELLERTH**, Plaintiff,

v.

**BURLINGTON INDUSTRIES, INC.**, Defendant.

No. 95 C 839.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 19, 1996.

Ernest Thomas Rossiello, Margaret Ann Zuleger, Rossiello & Associates, Chicago, IL, for plaintiff.

James J. Casey, Jeffrey Jerome Ward, Keck, Mahin & Cate, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Kimberly B. Ellerth ("Ellerth") sues defendant Burlington Industries, Inc. ("Burlington") for sex discrimination and constructive discharge under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Ellerth alleges that

while employed at Burlington she was inappropriately touched and sexually harassed by her superior, Theodore Slowik, subjecting her to a hostile work environment in violation of Title VII's prohibition against discrimination on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). Ellerth also contends that Slowik's harassment of her resulted in her constructive discharge. Burlington's motion for summary judgment is presently before the Court. After careful review, the Court finds that there is no genuine issue of material fact and judgment should be entered for Burlington on both counts of Ellerth's complaint as a matter of law.

## RELEVANT FACTS

■ The following undisputed facts are gleaned from the parties' respective Local Rule 12 statements of material facts and accompanying exhibits.[1] Burlington is a

1. The following facts are drawn from the parties' respective Local General Rule 12(M) and (N) statements of material facts as to which there is no genuine issue, and the accompanying exhibits, *see* UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS LOCAL GENERAL RULE 12. Local General Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." The movant's statement must contain "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." Burlington's statement shall be cited herein as "Def.'s Facts ¶ ___." Similarly, Local General Rule 12(N)(3)(a) requires the nonmoving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. Ellerth's response shall be cited as "Pls.' Facts ¶ ___." Pursuant to Local General Rule 12(N)(3)(b), the nonmoving party may also submit a statement of "additional facts that require the denial of summary judgement," with respect to which the movant, in turn, may respond. Ellerth did not file any such statement of additional facts. Instead, Ellerth frequently raised additional factual matters in her Rule 12(N)(3)(a) response by means of such expressions as: "Admit [or deny as the case may be]. *Ellerth adds, however ...*" The problem with Ellerth's departure from the Rules is that it affords Burlington no mechanism for responding to Ellerth's additional facts—there is no such thing, for example, as a reply to the nonmoving party's Rule 12(N)(3)(a) response. Accordingly, Burlington asks the Court to disregard the "tainted" portions of Ellerth's response. Of course, this is not a particularly proper means of

requesting action by a court. Essentially, Burlington seeks an Order from the Court striking Ellerth's response. As Federal Rule of Civil Procedure 7 instructs, "An application to the court for an order shall be by motion," not by way of a "request" stuck in a footnote in a reply brief. Had Burlington filed an appropriate motion, this issue could have been taken up by the parties in a timely fashion. Instead, here the Court sits with a fully briefed dispositive motion, with one party requesting this Court to disregard this or that factual assertion.

It strikes the Court that there are several alternatives here. First, the Court could attempt to "disregard" portions of Ellerth's 12(N)(3)(a) submission as Burlington requests. This approach would entail a somewhat artificial parsing of Ellerth's response and would not substantially serve the ends of justice. Alternatively, the Court could strike Ellerth's response and direct her to file an appropriate Rule 12(N)(3)(a) statement and a Rule 12(N)(3)(b) statement (if that is her desire), to which Burlington could then formally respond. Or, the Court could simply grant Burlington time to respond, if it desires, to Ellerth's Rule 12(N)(3)(a) submission—thereby affording Burlington the opportunity to controvert any "additional factual assertions" made by Ellerth. Of course, Burlington has not indicated that it desires any opportunity to respond or that it believes Ellerth's factual representations are incorrect. Both of these latter approaches involve needless delay. Accordingly, having carefully and fully considered all of the materials before it, the Court concludes that the wisest course here is to deny Burlington's request and to consider all factual assertions made by Ellerth (to the extent that they are supported by the record).

manufacturer of textiles and home furnishings which employs over 22,000 people and operates more than 50 plants and offices around the United States, including a Chicago office. (Def.'s Facts ¶¶ 2, 5). Ellerth first interviewed with Burlington in mid-March 1993, at which time she was interviewed by Mary Strenk Fitzgerald ("Fitzgerald"). Fitzgerald was a national accounts manager in Burlington's Mattress Fabric (or "Ticking") division. Shortly after the Fitzgerald interview, Ellerth had a second interview, this time meeting with Theodore Slowik ("Slowik"), who holds the position of vice president of sales and marketing for Burlington's House Mattress Ticking division and who works out of Burlington's New York office. About one week later, Fitzgerald called Ellerth to offer her the position of merchandising assistant in the Chicago office. Ellerth accepted.

As a merchandising assistant, Ellerth assisted Fitzgerald in her day to day activities. She also spoke with Slowik by phone approximately once per week. Additionally, Ellerth's position required occasional travel, generally for training-related purposes. Ellerth's immediate supervisor while she held this position was Fitzgerald. (*Id.* ¶ 11). Fitzgerald reported directly to Slowik. (Pl.'s Facts ¶ 11).

In February and March of 1994, following interviews with Patrick Lawrence and Slowik, Ellerth received a promotion to the position of sales representative for the Ticking Division's Midwest territory. (Def.'s Facts ¶ 12). Lawrence became Ellerth's immediate supervisor after that promotion. In turn, Lawrence reported to Slowik.

Throughout her employment at Burlington, Ellerth saw Slowik when he came to Chicago, on average, for a day or two every month or two. (*Id.* ¶ 17). In addition, Ellerth states that she saw Slowik when she traveled to New York, North Carolina and San Francisco for training, and that she spoke with Slowik approximately once a week. (Pl.Dep. at 49, 58, 93–94, 131, 215–216).

However, unlike properly presented 12(N)(3)(b) factual assertions, the Court will not deem them

Ellerth claims that Slowik's harassment of her began as early as her preemployment interview with him. Ellerth contends that during that interview, Slowik asked her if she was married, if she planned on having a family, and if she was "practicing" to have a family. Ellerth further alleges that Slowik stared at her in a sexual way such as staring at her chest for prolonged periods of time, and staring at her legs. Ellerth contends that the stares were constant throughout the entire interview and that she felt "humiliated" during the interview. (Def.'s Facts ¶ 18). Notwithstanding this experience, after the interview, Ellerth sent a follow-up letter to Fitzgerald in which she wrote, "I appreciated the chance to meet with Mr. Slowik before he returned to New York. The insight that he gave me into the position only provided me with more incentive to take the job he offered."

The next time Ellerth saw Slowik—the summer of 1993, when she travelled to New York for training—the harassment allegedly continued. (Def.'s Facts ¶ 20). Ellerth was in New York for approximately five days. Although she could not recall the exact number of times she saw Slowik in New York, Ellerth testified that she had more than five conversations, most lasting about five minutes, but two that were longer (about an hour) in duration. The first of these two longer conversations took place in Slowik's office. Slowik allegedly told one off-colored joke at the end of that conversation. Ellerth does not remember the content of the joke. (*Id.* ¶¶ 22, 23; Ellerth Dep. at 57–66). Ellerth testified that there were "around four" incidents during her training trip to New York in which Slowik told off-colored, offensive jokes. (*Id.* ¶ 23; Ellerth Dep. at 63, 65).

The second extended conversation Ellerth had with Slowik in New York took place during a lunch meeting at a restaurant near Burlington's New York office in which Angelo Brenna, Burlington's vice president of international sales, was also present. The lunch lasted approximately one to one and a half hours during which time Ellerth claims Slowik told "well over ten," offensive jokes of

admitted as a result of Burlington's failure to properly respond.

a sexual nature. Although she could not recall the exact number of offensive jokes, Ellerth testified that they were frequent and constant. (Def.'s Facts ¶ 24; Ellerth Dep. at 70–71). Ellerth also testified that during one of these jokes, Slowik reached over and rubbed her knee under the table. Ellerth pulled her leg away and said nothing to Slowik or Brenna; Ellerth assumed Brenna had not seen the rubbing. (Def.'s Facts ¶ 24; Ellerth Dep. at 75–76). While walking back to the Burlington office after lunch, Ellerth was walking about three or four feet in front of Slowik and Brenna when Slowik allegedly commented, "you have got great legs, Kim. What do you think, Angelo?" (Id. ¶ 25). Ellerth testified that, after that remark was made, she turned and looked at Slowik who was staring at her legs. (Ellerth Dep. at 81). Ellerth testified that when she returned to the office after lunch, she told two women, one named Marilyn and the other named Laura Peffal, that Slowik and Brenna had been "very loud and obnoxious and rude and very offensive at lunch." (Pl.Dep. at 82–83). Ellerth had no other interactions with Slowik in New York.

Following the New York trip, Ellerth has no specific recollection of seeing or speaking with Slowik until approximately one month later when she traveled to Greensboro, North Carolina for additional training.[2] Ellerth was in North Carolina for one work week (i.e., Monday through Friday). (Def.'s Facts ¶ 27). Ellerth first saw Slowik in North Carolina about three days after she arrived, when she had dinner with Slowik, a sales representative named Dan, and Dan's wife. Ellerth states that Slowik was loud and obnoxious during dinner and gave the waitress a hard time. Ellerth's deposition testimony regarding the nature of Slowik's offensive conduct vis-a-vis the waitress is indefinite at best. She testified that she did

not recall how Slowik was giving the waitress a hard time. When first asked if he was giving the waitress a hard time "in a sexual way" or "making offensive sexual comments to her," Ellerth stated that she could not recall. (Ellerth Dep. at 103). Upon further inquiry, Ellerth responded that Slowik's comments were "probably" about the waitress' appearance because that is what Ellerth would find offensive. (Id.; see also id. at 117 ("I recall that I was very offended with what he said to the waitress, and I know the only way that I would be offended or embarrassed is if there was a situation where he was talking sexually offensive")).

Upon returning to the hotel after dinner, Slowik invited Ellerth to accompany him to the hotel lounge. Ellerth accepted. Ellerth testified that, while in the lounge, Slowik commented about the female band members stating that they had nice breasts, nice legs and nice, skimpy outfits. (Def.'s Facts ¶ 29). Ellerth further states that, regarding breasts, Slowik asked, "[y]ou are a little lacking in that area, aren't you Kim?" Ellerth did not reply to Slowik's comments and she claims that Slowik told her that she "ought to loosen up." (Id.). At the bar, Slowik allegedly engaged in prolonged looks at Ellerth's breasts and legs. Upon leaving the bar, Ellerth claims that Slowik stated, "You know, Kim, I could make your life very hard or very easy at Burlington." (Id.). Ellerth understood this comment to mean that she would have to have sex with Slowik to succeed at Burlington. (Ellerth Aff. ¶ 22). Ellerth could not recall seeing Slowik again during her week in North Carolina, and believed that that evening was the only time she talked to him that week.

Following the North Carolina trip, Ellerth next specifically recalled seeing Slowik in the fall of 1993 when he visited the Chicago office.[3] Ellerth was on the floor folding fab-

---

**2.** Ellerth specifically stated that she could not recall talking to Slowik between the New York trip and the North Carolina trip. (Ellerth Dep. at 163). Immediately thereafter she stated that Slowik had called her "before [her] training visits to ask [her] questions if Betsy [Fitzgerald] was not around." (Id.) Ellerth further stated that every single time she talked to him on the phone, Slowik made a sexually inappropriate comment to her. (Id. at 164.) Other than "Kim, how are

your legs," Ellerth could not recall any specific comments. (Id.)

**3.** In her deposition, Ellerth testified that she believed that there was at least one other time, between the summer and fall of 1993, when Slowik was at the Chicago office, but she had no specific recollection of seeing him. (Ellerth Dep. at 130–31).

ric samples when Slowik walked by with another employee and allegedly commented, "on your knees again, Kim?" (Def.'s Facts ¶ 32). Ellerth understood the comment to be a reference to fellatio, which she found to be degrading and offensive. (Ellerth Aff. ¶ 27). On another occasion during which Slowik was in the Chicago office in the fall of 1993, he was making phone calls from Ellerth's office and when she walked in to the office, Slowik commented, "It's nice to have my butt where your butt was, Kim." (Def.'s Facts ¶ 34).

The next specific incident in which Ellerth could recall seeing Slowik was at the company holiday party in December, 1993. Ellerth claims that Slowik approached her husband, patted him on the shoulder and said, "You are a lucky man to have a woman like that," referring to the plaintiff. (Ellerth Dep. at 148). In addition, plaintiff alleges that Slowik patted her rear as he walked past her during the party. (Def.'s Facts ¶ 35).

The next incident that Ellerth could specifically recall in which she saw Slowik was her promotion interview in March of 1994.[4] At this interview, Ellerth claims that Slowik agreed he had told others that she was "arrogant" because she was not "loose enough" for him, and that this gave him hesitations about promoting her. (Def.'s Facts ¶ 36; Ellerth Dep. at 199). Ellerth also states that Slowik reached over and rubbed her knee during the interview, and when discussing the travel associated with the new position, Slowik asked, "isn't your husband going to miss you." (Def.'s Facts ¶ 36). When he called to inform her that she had received the promotion, Slowik allegedly made a sexually inappropriate comment that caused Ellerth to cry. She could not recall the comment.[5] (Def.'s Facts ¶ 37).

Later that same month, plaintiff traveled to San Francisco for a bedding conference. Ellerth claims that she saw Slowik often but for the first three or four days Slowik ignored her. Ellerth believes that this was because she had not responded favorably to

his harassment. (Pl.Dep. at 216, 244). However, on the last day of the conference, Slowik allegedly made a sexually inappropriate comment to Ellerth about her "ass." (Def.'s Facts ¶ 38). Slowik allegedly was staring at Ellerth's "back end" when he made this comment. (Ellerth Dep. at 247). The incident caused Ellerth to run to the bathroom to cry.

The foregoing incidents involve Ellerth's face-to-face interactions with Slowik. During her employment at Burlington, Ellerth spoke with Slowik by phone repeatedly; Ellerth claims that Slowik's harassment of her was a common feature of these phone conversations. The conversations were brief—usually Slowik would ask a work-related question and Ellerth would answer. Ellerth estimated that the frequency of these calls was approximately once per week. (Ellerth Dep. at 131, 163). Although Ellerth testified that Slowik did not tell vulgar jokes on the phone, she stated that "there were sexual innuendos on the phone, all phone conversations." (*Id.* at 132). As specific examples of Slowik's comments, Ellerth recalled being asked by Slowik, "How are those legs of yours, Kim?" Slowik also asked Ellerth if she was still practicing having a family with her husband. (*Id.* at 132–33). In a phone conversation that occurred in February or March of 1994, Slowik allegedly said to Ellerth that it "must be hard for a woman like you, Kim, to have a job like that—a woman with great legs." (*Id.* at 172, 174). In a phone conversation that occurred in April of 1994, Slowik allegedly told Ellerth "a very offensive joke about blonds, a limo and sex." (*Id.* at 253). Although she could not recall the specifics of the joke during her deposition, Ellerth has submitted an affidavit along with her opposition to the instant motion for summary judgment in which she recounts the joke as follows: "What's the difference between a blonde and a limo? Not everyone's been in a limo." (Ellerth Aff. ¶ 45). On another occasion, when Ellerth was talking to Slowik to

---

**4.** Ellerth testified that there were other occasions, following the holiday party and prior to her promotion interview in March of 1994, when Slowik was at the Chicago office and said things to her that upset her; however, she had no specific recollection of those incidents.

**5.** Ellerth testified that "every time I was on the phone with him I ended up most—in tears." (Ellerth Dep. at 206–07).

get special permission to do something for a customer, Slowik said something along the lines of "I don't have time for you right now, Kim, unless you're telling me—unless you want to tell me what you are wearing." Ellerth said she had to go and hung up. On a follow up call, again to get permission, Slowik told Ellerth that she did not have permission for the project and he then said something along the lines of "are you wearing shorter skirts yet, Kim, because it would make your job a whole heck of a lot easier." (*Id.* at 256–58). These latter calls occurred in about May of 1994.

Ellerth was aware throughout her employment that Burlington maintained a policy against sexual harassment. (Pl.Dep. at 358). She received a copy of Burlington's employee handbook and read the policy against sexual harassment in the handbook. (*Id.;* Def.'s Facts ¶ 42). Ellerth chose not to inform her supervisors or anyone in authority regarding Slowik's conduct because her husband advised her not to say anything to anyone because it would jeopardize her job. (Pl.'s Facts ¶ 43). Ellerth never informed Fitzgerald or Lawrence, her direct supervisors, about the alleged harassment while she was employed at Burlington. (Def.'s Facts ¶¶ 44, 45). Ellerth stated that she chose not to inform Lawrence because "it would be his duty as my supervisor to report any incidents of sexual harassment," thus putting her job in jeopardy. (Def.'s Facts ¶ 45; Pl. Dep. at 357). Ellerth claims that she told several Burlington employees and one Burlington customer that she was being harassed by Slowik.[6] Ellerth admits that none of the employees were her superiors. (Pl.'s Facts ¶ 46). Ellerth did complain to her husband and parents on numerous occasions that Slowik sexually harassed her from the beginning of her employment with Burlington. (Def.'s Facts ¶ 47). On one occasion, after Slowik made an "embarrassing and humiliating" sexual innuendo, plaintiff claims that she told Slowik that what he said was inappropriate. (Rule 12(M) ¶ 48; Pl.Dep. at 143–145).

In May of 1994, approximately two months after Ellerth received her promotion, Lawrence and Donna Thibideau, Burlington's Customer Service manager received some complaints about Ellerth. (Pl.'s Facts ¶ 14). Lawrence sent Ellerth a memorandum on May 22, 1994 regarding the complaints he had received. (Def.'s Facts ¶ 15; Ellerth Dep., Ex. 2). On May 31, 1994, Ellerth left a message on Lawrence's answering machine informing him that she was quitting. She also faxed him a letter to the same effect. The letter received by Lawrence did not mention that plaintiff had been sexually harassed by Slowik. (Def.'s Facts ¶ 16). Ellerth claims that the letter she transmitted to Lawrence did not refer to the sexual harassment because, on her husband's advice, she had redacted the sentences she had written regarding her harassment. (Pl.'s Facts ¶ 16). (Rule 12(M) ¶ 16). About three weeks later, in a letter dated June 21, 1994, Ellerth wrote to Lawrence, essentially stating that she had quit because she was being harassed by Slowik. (Pl.'s Ex. I).

### DISCUSSION

*Summary Judgment Standards*

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the nonmovant's favor. *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable, or is not significantly probative, summary judgment may be

---

6. Each individual denies that Ellerth ever complained of sexual harassment by Slowik. However, in a motion for summary judgment, this Court must look at all evidence in the light most favorable to the non-moving party. Therefore, the Court will assume that plaintiff informed these individuals of the alleged harassment for purposes of this motion.

granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024, 1032 (7th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In determining whether a genuine issue exists, the court "must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby,* 477 U.S. at 254, 106 S.Ct. at 2513. In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge when deciding a motion for summary judgment. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513–14. Finally, we note that mere conclusory assertions, unsupported by specific facts, made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a proper motion for summary judgment. *See Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985) ("Conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact").

*Hostile Environment Sexual Harassment*

 Title VII prohibits "discriminat[ion] ... against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1). Title VII's prohibition against sex discrimination includes sexual harassment in the workplace. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). Courts commonly distinguish between two types sexual harassment: *quid pro quo* harassment and hostile work environment harassment. *Quid pro quo* harassment occurs where the employer conditions tangible employment benefits on submission

to sexual demands. *See Dockter v. Rudolf Wolff Futures, Inc.,* 913 F.2d 456, 461 (7th Cir.1990). To establish harassment of the hostile work environment type, the plaintiff must establish that the challenged conduct " 'has the purpose or effect of unreasonably interfering with [the] individual's work performance or creating an intimidating, hostile or offensive working environment.' " *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2405 (quoting 29 C.F.R. § 1604.11(a)(3)). Significantly, *Meritor* held that "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Id.* at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). As the Seventh Circuit recently noted:

> To determine whether the plaintiff's work environment is hostile within the meaning of Title VII, we consider a variety of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 534 (7th Cir.1993) (quoting *Harris v. Forklift Sys. Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)); *see also Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir.1994) (noting that "not all conduct that has sexual overtones can be characterized as the sort of sexual harassment that is forbidden by the statute. For the harassment to be actionable, it must be sufficiently severe or pervasive as to alter the conditions of the victim's employment and to create an abusive working atmosphere."); *Koelsch v. Beltone Electronics Corp.,* 46 F.3d 705, 708 (7th Cir.1995) ("Isolated and innocuous incidents do not support a finding of sexual harassment."). The inquiry focuses on the totality of the circumstances and no single factor is required or determinative. *Id.* Finally, these factors are evaluated from both a subjective and objective viewpoint. That is, the actual effect of the conduct on the plaintiff is considered as is the likely impact on a reasonable

person in the plaintiff's position. *Id.; Doe,* 42 F.3d at 444; *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1454–57 (7th Cir.1994).

In the instant case, and for purposes of this motion only, Burlington does not dispute the occurrences of Slowik's harassing conduct as alleged by Ellerth.[7] Rather, Burlington advances several arguments as to why, as a matter of law, it can not be found liable for Slowik's conduct. First, Burlington contends that Ellerth's complaint is untimely as to most of the alleged conduct and that the remaining conduct does not amount to actionable sexual harassment because it is not sufficiently severe or pervasive. In this regard, Burlington contends that Ellerth cannot invoke the "continuing violation" doctrine to bring the untimely conduct within the ambit of her complaint. Burlington's second principal contention is that it cannot be held liable for Slowik's conduct because it did not know, or have reason to know, of Slowik's conduct. We address these arguments in turn below.

1. *Timeliness and the Continuing Violation Doctrine*

■ As Burlington correctly observes, in Illinois a complainant must file a charge of discrimination within three hundred days of the alleged harassment. Conduct occurring more than 300 days before the filing of a charge of discrimination cannot be the sole basis of a Title VII sexual harassment claim. *Koelsch,* 46 F.3d at 707. Ellerth filed her charge of discrimination on October 17, 1994; therefore, only conduct that took place after December 20, 1993 can serve as the basis for Ellerth's recovery under Title VII, unless the continuing violation doctrine applies. Under that theory, acts of discrimination that are otherwise time-barred may be actionable under certain limited circumstances. *See, generally, Stewart v. CPC Int'l, Inc.,* 679 F.2d 117 (7th Cir.1982); *Selan v. Kiley,* 969 F.2d 560 (7th Cir.1992).

■ This Court recently discussed the parameters of the continuing violation theory in *Egan v. Palos Community Hosp.,* 889 F.Supp. 331, 334–337 (N.D.Ill.1995). There, we noted that the Seventh Circuit has recog-

nized three viable theories under which a plaintiff may successfully appeal to the continuing violation theory. *See id.* at 335. Only one of those theories, the "serial violation" or "pattern of ongoing discrimination" theory is relevant here, and we confine our discussion to that theory. The Seventh Circuit has described this theory as applying to:

> cases in which the plaintiff charges that the employer has, for a period of time, followed a practice of discrimination, but has done so covertly, rather than by way of an open notorious policy. . . . In such cases the challenged practice is evidenced only by a series of discrete, allegedly discriminatory, acts. This brand of continuing violation has also been referred to as a "serial violation," *Mack,* 871 F.2d at 183, and as a "pattern of ongoing discrimination." *Santos v. Rush–Presbyterian–St. Luke's Med. Ctr.,* 641 F.Supp. 353, 357 (N.D.Ill.1986).

*Selan,* 969 F.2d at 565. In order to invoke this variant of the continuing violation doctrine, Ellerth must show that defendant's acts were "related closely enough to constitute a continuing violation" rather than constituting "merely discrete, isolated, and completed acts which must be regarded as individual violations." *Id.* (internal quotation marks omitted). As we summarized in *Egan,* the pertinent factors to consider in making this distinction are:

> (1) subject matter—"Do the alleged acts involve the same type of discrimination tending to connect them in a continuing violation?" *id.;* (2) frequency—"Are the alleged acts recurring (e.g., a bi-weekly paycheck) or more in the nature of an isolated work assignment or employment decision?" *id.;* and, (3) degree of permanence—"Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights?" *Id.* Of these three factors, the third is the most significant. *Id.* As explained in *Malhotra v. Cotter & Co.,* 885 F.2d 1305 (7th Cir.1989):

---

7. In light of Burlington's admission on this point, the Court will dispense with the hedge "alleged-

ly," as in "Slowik 'allegedly' rubbed Ellerth's knee."

What justifies treating a series of separate violations as a continuing violation? Only that it would have been unreasonable to require the plaintiff to sue separately on each one. In a setting of alleged discrimination, ordinarily this will be because the plaintiff had no reason to believe he was a victim of discrimination until a series of adverse actions established a visible pattern of discriminatory treatment. *Id.* at 1310.

*Egan,* 889 F.Supp. at 335–36. More recently, in *Moskowitz v. Trustees of Purdue University,* 5 F.3d 279 (7th Cir.1993), Judge Posner, writing for the court, explained:

If it is only with the benefit of hindsight, after a series of discriminatory acts, that the plaintiff can realize that he is indeed a victim of unlawful discrimination, he can sue in regard to all of the acts provided he sues promptly after learning their character.... If, however, he knows or with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed him, he may not sit back and accumulate all the discriminatory acts and sue on all within the statutory period applicable to the last one. So the fact that a series of discriminatory or otherwise unlawful acts is indeed a series, a continuum, rather than a concatenation of unrelated acts, will delay the deadline for suing with respect to the earliest acts in the series only if their character was not apparent when they were committed but became so when viewed in the light of the later acts.

*Id.* at 281–82. *See also Doe,* 42 F.3d at 446 (noting that "the purpose of permitting a plaintiff to maintain a cause of action on the continuing violation theory is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred").

▄ Ellerth's deposition testimony leaves little doubt that she was aware of the discriminatory nature of Slowik's conduct virtually from the outset of her contacts with him. She testified that Slowik's question during her initial interview about whether she was married was "inappropriate" and the question about whether she was practicing to have a family with her husband was "offensive" and "humiliating." *See* Pl.'s Facts ¶ 8. Indeed, she told her husband and her mother about Slowik's conduct. Ellerth Dep. at 92. However, she "did not complain about Slowik's offensive behavior during his initial interview ... in the 'follow-up' letter that [she] sent ... because Slowik's initial interview of me was merely the first incident in Slowik's campaign of sexual harassment against me and I was still hoping, at that point, that by ignoring Slowik's sexual harassment he might cease such behavior on his own." Ellerth Aff. ¶ 8. We have no reason to question Ellerth's approach to dealing with Slowik's harassment; however, it is plain from her own account that she was aware of the nature of his conduct.

Then, a couple of months later when Ellerth travelled first to New York and later to North Carolina, Slowik's campaign of sexual harassment continued. Again, there can be little doubt from Ellerth's testimony that she was well aware of the harassing nature of Slowik's behavior. She referred to the jokes that Slowik told to her in his New York office as "off-colored," "dirty" and "offensive." Pl.'s Facts ¶ 23. She also testified that she could not recall more of the details concerning the joke Slowik told during her first long meeting with him in New York "because it had offended [her] so badly." Ellerth Dep. at 64. Similarly, she characterized Slowik's conduct (specifically the rubbing of her knee) at the luncheon meeting at a New York restaurant as "highly offensive and unwelcome." Ellerth Aff. ¶¶ 12, 13. She also attested that she felt "humiliated and degraded" by Slowik's comment about her legs on the walk back to the New York office after lunch. *Id.* ¶ 14.

Ellerth also states in no uncertain terms that she was aware of the nature of the sexual harassment to which she was being subjected after Slowik's conduct during her training visit to North Carolina. In her affidavit, after recounting Slowik's repeated comments concerning the bodies and clothes of the all-woman band in the hotel lounge, his comment about her breasts, his comment that she should "loosen up," and most significantly his comment that he "could make [her]

life very hard or very easy at Burlington," Ellerth attested:

> I understood Slowik's comment, "you know, Kim, I could make your job very hard or very easy at Burlington," as clearly implying that I would have to engage in sexual relations with Slowik in order to succeed in the business. Slowik's implication that he could make my life at Burlington very hard or very easy depending on whether I engaged in sexual relations with him was clear to me given the totality of the circumstances up to that point, namely Slowik's prior inappropriate comments regarding my appearance and my intimate marital relations, his staring at my breasts and legs, and his unwelcome and offensive touchings of my knees.

Ellerth Aff. ¶ 22. In view of Ellerth's clear awareness of the fact that Slowik was engaging in sexual harassment of her—an awareness that had crystallized in her mind certainly no later than the summer of 1993, she could not "sit back and accumulate all the discriminatory acts and sue on all within the statutory period applicable to the last one." *Moskowitz,* 5 F.3d at 282. Plainly, by the summer of 1993, Slowik's discriminatory conduct had the degree of permanence that should have triggered Ellerth's awareness of and duty to assert her rights.[8] *Selan,* 969 F.2d at 565. Accordingly, we conclude that Ellerth cannot invoke the continuing violation doctrine to bring Slowik's time-barred conduct within the scope of the instant complaint. To the extent, if any, that Ellerth can prevail in her sexual harassment suit, her recovery may only be predicated on Slowik's conduct that occurred after December 20, 1993.

### 2. *Hostile Work Environment*

■ Although Ellerth can only recover for harassment occurring after December 20, 1993, this does not require that an "iron curtain" be dropped on December 20, 1993, shielding from consideration all evidence of Slowik's conduct before that day when considering whether Ellerth was subjected to an actionable hostile work environment. *Cf. Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1349 (7th Cir.1995). In *Hennessy,* the district court allowed in evidence of the employer's discriminatory conduct that occurred prior to November 21, 1991, the effective date of the Civil Rights Act of 1991. On appeal, after being found liable for sex discrimination and subject to a $300,000 punitive damage award, the employer claimed that it was improperly subject to retroactive liability because the trial court allowed the plaintiff to present evidence of pre-November 21, 1991 conduct. The Seventh Circuit squarely rejected this claim:

> To read *Landgraf* as Penril urges would drop an iron curtain on November 21, 1991, shielding from view all evidence before that day. That would be an absurd situation as it would keep from the jury substantial evidence that could aid it in reaching a just verdict. The district court properly held that *Landgraf* did not prohibit the jury from hearing about pre-Act conduct of Penril and its agents which provided context and background regarding Hennessy's termination. . . .

*Hennessy,* 69 F.3d at 1349.

■ This Court believes that analogous reasoning permits it to consider Slowik's pre-December 20, 1993 conduct when considering the totality of Ellerth's circumstances at work and determining whether her work conditions amounted to a hostile environment.[9] It would be absurd to conclude that Slowik's conduct after December 20, 1993, had to be evaluated in a vacuum and without the context of his prior conduct. *Cf. Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668,

---

8. In opposition to Burlington's motion for summary judgment, Ellerth has submitted a summary chart of Slowik's sexual harassment, which chronicles each instance of harassment. Although the chart must be taken with a very large grain of salt (for instance, it assigns 15 instances of harassment to Ellerth's initial interview with Slowik), by Ellerth's own count, by the end of the summer of 1993 she had been subject to approxi- mately 70 instances of harassment. *See* Pl.'s Ex. B.

9. Of course, in the event that Ellerth survives the instant motion for summary judgment and proceeds to trial, a carefully drafted jury instruction will be given to the jury instructing them as to the proper and improper use of evidence pertaining to pre-December 20, 1993 conduct.

675 (7th Cir.1993) (noting that the court must consider the cumulative weight of several racial comments); *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1274–75 (7th Cir.1991) (noting that the acts of racial harassment must be considered in the context of ten years of verbal taunting). We have little difficulty concluding that Ellerth has raised a genuine issue of material fact as to whether she was subjected to a hostile work environment as a result of Slowik's conduct.

Burlington is quick to note that only a handful of harassing incidents occurred after December 20, 1993; however, when those incidents are viewed in the context of Slowik's pre-December 20 conduct, it is clear to this Court that it cannot hold, as a matter of law, that Ellerth was not subject to a hostile work environment. A reasonable jury could easily find that Slowik's pre-December 20, 1991 conduct—specifically his repeated objectification of her body, his weekly dirty joke phone calls, and his implicit statement that life for Ellerth could be very easy or very difficult for her depending on whether she submitted to his advances—deprived her of the "right to work in an environment free from discriminatory intimidation, ridicule and insult" and materially altered the conditions of her employment. *Meritor*, 477 U.S. at 65, 106 S.Ct. at 2405. Slowik's continuation of that conduct after December 20, 1991 perpetuated the existence of that hostile environment and the severity or pervasiveness of Slowik's conduct must be evaluated with reference to his prior conduct.

Specifically, this Court believes that a reasonable jury could find that Slowik's conduct in March of 1994, during which he rubbed Ellerth's knee while engaged in a promotional interview with Ellerth, could be regarded as reinforcing Slowik's previous persistent implicit messages to her that her value was as a sex object and that her growth in the company was dependent upon her sexual availability to him. So too could the jury find with respect to the April 1994 phone conversation in which Ellerth called to request special permission to put a customer's logo into some fabric and Slowik responded, "I don't have time for you right now, Kim, unless you tell me what you're wearing." Surely, a reasonable jury could find that this comment was tantamount to saying, "I, as your supervisor will have no time for you and will not assist you unless you talk dirty to me," and that such a statement (particularly viewed in the context of Slowik's previous "I could make life very hard for you" remark) deprived Ellerth of a workplace free from discriminatory intimidation, humiliation and insult. Of course, this is equally true with respect to Ellerth's follow-up call in which Slowik denied Ellerth's request for permission and then inquired whether she was wearing shorter skirts yet because that could make her job "a whole heck of a lot easier."

It is very important to recognize in this regard that imbedded in Slowik's harassment of Ellerth is a *quid pro quo* proposition, dating back to the summer of 1993, which a jury could reasonably find pervaded her employment at Burlington.[10] It would not be unreasonable to conclude that every effort toward achievement that Ellerth made at Burlington was tainted by Slowik's threat, "I could make life very hard for you." Moreover, a jury could reasonably find that Slowik's "joke," "What's the difference between a

---

10. We do not mean to suggest that Ellerth has advanced a claim of *quid pro quo* sexual harassment. She has not. Both her complaint and memorandum of law opposing Burlington's motion for summary judgment expressly indicate that the nature of Ellerth's sexual harassment claim is that she was subject to a hostile work environment. (Indeed, there is authority to the effect that for Ellerth to prevail on a theory of *quid pro quo* harassment, she would have to prove that Slowik actually withheld tangible employment benefits as a result of her failure to submit to his sexual overtures. *See Gary v. Long*, 59 F.3d 1391, 1396 (D.C.Cir.1995); *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178,

186 (6th Cir.1992); *Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 649 (6th Cir.1986); *Jansen v. Packaging Corp. of Am.*, 895 F.Supp. 1053 (N.D.Ill.1995).)

Our point here is simply that where a supervisor brandishes work-related threats or promises predicated on an employee's submission to sexual conduct, an overlap between *quid pro quo* and hostile work environment harassment develops. *See Gary v. Long*, 59 F.3d at 1396 ("Where a supervisor's mere threat or promise of job-related harm or benefits in exchange for sexual favors does not constitute *quid pro quo* harassment, either may create or contribute to a hostile work environment.").

blonde and a limo? Not everyone's been in a limo," made during an April 1994 phone conversation, heaped insult upon injury by effectively communicating the message that Ellerth is a whore or a slut who sleeps with everybody.

In the final analysis, we are not persuaded by Burlington's arguments that Slowik's conduct was not severe or pervasive enough to alter the conditions of Ellerth's employment. Specifically, we reject Burlington's efforts at minimizing the pervasiveness of Slowik's harassment by noting that Ellerth *saw* Slowik on only a few occasions. Ellerth's testimony, which Burlington does not dispute for purposes of this motion, is that Slowik spoke with her approximately once per week and that Slowik made an offensive comment during every phone conversation. We believe that a reasonable jury could conclude that this conduct was sufficiently pervasive notwithstanding the fact that it was accomplished by long distance. The Court certainly agrees with Burlington that Ellerth's inability to recall the specifics of virtually all of Slowik's offensive comments greatly impairs the Court's ability to make a determination as to whether the comments are sufficiently severe. However, in evaluating Ellerth's conditions of employment we ask whether the discriminatory conduct is sufficiently severe *or* pervasive, *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405–06, and we cannot conclude that Slowik's conduct was not sufficiently pervasive. *See Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1270 (7th Cir.1991) (finding that although an offensive utterance alone does not give rise to Title VII liability, a pervasive pattern of racial jokes could be sufficient to sustain a hostile environment claim). Additionally, in view of the uncontested facts regarding Slowik's

other comments that Ellerth *could* recall, we believe a jury could resolve this uncertainty in favor of Ellerth and conclude that Slowik's comment's were sufficiently severe. *See Dey,* 28 F.3d at 1456–57. For all of the foregoing reasons, we conclude that Burlington is not entitled to judgment as a matter of law based on the contention that Slowik's conduct was not sufficiently pervasive or sever to create an actionable hostile work environment. Therefore the Court turns to the critical issue in this case: whether Slowik's alleged conduct imposes liability on his employer, Burlington.

*Burlington's Liability for Slowik's Conduct*

■ Since the Supreme Court's opinion in *Meritor,* it is clear that employers are not strictly liable for the discriminatory acts of their employees—even those employees at the supervisory or management level. *See Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408. Instead, *Meritor* instructs that courts should look to agency principles when evaluating whether employers should be held liable for the discriminatory acts of their supervisors.[11] *Id.; see also Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 445 (7th Cir.1994) ("whether sexual harassment by a supervisor can be imputed to the employer corporation is governed by the principles of agency").

Following *Meritor,* many courts of appeal have issued opinions that attempt to delineate the parameters of employer liability under general principles of agency law. *See, e.g., Tomka v. Seiler Corp.,* 66 F.3d 1295 (2d Cir.1995); *Karibian v. Columbia Univ.,* 14 F.3d 773, 780 (2d Cir.1994); *Gary v. Long,* 59 F.3d 1391, 1395 (D.C.Cir.1995); *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343 (4th Cir. 1995); *Nichols v. Frank,* 42 F.3d 503, 514 (9th Cir.1994); *Bouton v. BMW of North*

---

**11.** Now that the majority of courts of appeals that have considered the issue have held that supervisors can not be found liable in their individual capacities for their discriminatory conduct, *see, e.g., U.S. E.E.O.C. v. AIC Security Investigations, Ltd.,* 55 F.3d 1276 (7th Cir.1995); *Smith v. Lomax,* 45 F.3d 402, 403–04 & n. 4 (11th Cir.1995); *Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 510 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994); *Grant v. Lone Star Co.,* 21 F.3d 649, 651–53 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994); *Miller v.*

*Maxwell's Int'l,* 991 F.2d 583, 587–88 (9th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994), the question of employer liability has taken on added significance. As this Court foreshadowed in *Jendusa v. Cancer Treatment Centers of Am., Inc.,* "in those cases in which agency principles lead to the conclusion that the institutional employer is not liable for the conduct of its agent, a determination that Title VII does not authorize individual. liability would effectively leave the victim without an adequate remedy...." 868 F.Supp. 1006, 1013 n. 9 (N.D.Ill.1994).

*Am.,* 29 F.3d 103, 106 (3d Cir.1994); *Hirschfeld v. New Mexico Corrections Dept.,* 916 F.2d 572, 576 (10th Cir.1990); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1418 (10th Cir. 1987); *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1559 (11th Cir.1987). To date, the Seventh Circuit has not published any opinion that provides much guidance on how agency principles are to be applied in this context. *See Jansen,* 895 F.Supp. at 1060–61. Thus, we shall look for guidance in the opinions of our sister circuits, as well as Judge Shadur's recent opinion in *Jansen v. Packaging Corp. of Am.,* 895 F.Supp. 1053 (N.D.Ill.1995).

Taking their lead from *Meritor*'s reference to the Restatement (Second) of Agency ("Restatement"), 477 U.S. at 72, 106 S.Ct. at 2408, most courts have looked to the Restatement for the guiding agency principles and have looked specifically to § 219. *See* citations *supra.* As the Third Circuit summarized in *Bouton:*

> The *Restatement (Second) of Agency* § 219 provides three potential bases for holding employers liable for sexual harassment perpetrated by their employees. Section 219(1) holds employers responsible for torts committed by their employees within the scope of their employment. Two of the four reasons listed in § 219(2) for imposing liability when an employee acts outside the scope of employment could also apply. Under § 219(2)(b), masters are liable for their own negligence or recklessness; in a harassment case, this is typically negligent failure to discipline or fire, or failure to take remedial action upon notice of harassment. Finally, under § 219(2)(d), if the servant relied upon apparent authority or was aided by the agency relationship, the master is required to answer.

*Bouton,* 29 F.3d at 106. We now consider these potential bases for Burlington's liability.

Under § 219(1), the pertinent inquiry is whether Slowik's harassment of Ellerth was committed within the scope of his employment. In *Jansen,* the court found § 219(1) "plainly inapplicable" and brushed this question aside with a footnote: "Was sexual harassment within the scope of [the supervisor's] employment? Of course not." 895 F.Supp. at 1061 n. 9. Other courts have similarly held, *see Hicks,* 833 F.2d at 1417–18 ("sexual harassment simply is not within the job description of any supervisor or any other worker in any reputable business"), and we do not necessarily disagree. However, we do not believe that the question can be brushed aside quite so readily. Whether or not sexual harassment is, as the *Hicks* court put it, in the job description is quite beside the point. The Restatement makes clear that acts forbidden by the employer may nevertheless be within the scope of employment—even when consciously criminal or tortious. RESTATEMENT (SECOND) OF AGENCY (hereafter RESTATEMENT) §§ 230, 231. Sections 228 and 229 of the Restatement set out several factors relevant to determining whether the conduct of a servant falls within the scope of his or her employment. Although we will not recount all of those factors here, we note that under § 228(1)(c) conduct of a servant is within the scope of employment if, and only if, the conduct "is actuated, at least in part, by a purpose to serve the master." RESTATEMENT § 228(1)(c). Conversely, "[c]onduct of a servant is not within the scope of employment if it is ... too little actuated by a purpose to serve the master." *Id.* § 228(2). Section 235 and the accompanying comments are also instructive in this regard. Section 235 provides: "An act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed." RESTATEMENT § 235. Comment a to this section explains:

> It is the state of the servant's mind which is material. Its external manifestations are important only as evidence. Conduct is within the scope of employment only if the servant is actuated to some extent by an intent to serve his master.

*id.,* cmt. *a.,* and comment *c* further notes:

> The fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business.... In such cases, the facts may

indicate that the servant is merely using the opportunity afforded by the circumstances to do the harm. Hence, unless the principal has violated a personal duty to the person injured, or unless he becomes liable because of the nature of the instrumentality entrusted to the servant, ... he is not liable for such acts.

*Id.,* cmt. *c; see also* cmt. *c* illustration 4.

 We believe that there can be no *per se* answer to whether sexual harassment is within the scope of a supervisor's employment but that each case must be analyzed on its own facts under the factors outlined in section 228 and 229. Certainly, it is within the realm of possibility that a supervisor's discriminatory intent could sufficiently overlap with an intent to serve the employer and that such harassing conduct could be found to be sufficiently actuated by a motive to serve the employer. Indeed, the Restatement explicitly recognizes this principle. *See* RESTATEMENT § 236 ("Conduct may be within the scope of employment, although done in part to serve the purposes of the servant...."); *see also id.* cmt. *b* (explaining that "[t]he fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability...."). However, this Court cannot conclude that Slowik's conduct was motivated in any way whatsoever by a purpose to serve Burlington; Slowik's conduct did not serve to accomplish any authorized purpose. Accordingly, we conclude that Burlington cannot be found liable for Slowik's conduct under § 219(1).

 We next consider § 219(2)(b), which subjects an employer to liability for the acts of its employees acting outside the scope of their employment where the employer was negligent or reckless. This is by far the most commonly invoked basis for imposing employer liability and the Seventh Circuit's pronouncements that employer liability is generally governed by a negligence standard, *see, e.g., Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 431–32 (7th Cir.1995) ("the criterion for when an employer is liable for sexual harassment is negligence"); *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 535 (7th Cir.1993); *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 465 (7th Cir.1990), can be traced to this provision. *See North v. Madison Area Ass'n for Retarded Citizens,* 844 F.2d 401, 407 (7th Cir.1988) (recognizing *Meritor*'s admonishment to look to traditional agency principles and noting *Meritor*'s reference to sections 219–237 of the Restatement). In this case, it is clear that Ellerth cannot invoke § 219(2)(b) as a basis for imposing liability on Burlington for Slowik's conduct. Ellerth's own testimony establishes that although she was aware of Burlington's policy against sexual harassment, she never informed her immediate supervisor, Pat Lawrence, about Slowik's harassment because she feared it would put her job in jeopardy. Ellerth's deposition testimony was as follows:

Q. Why didn't you ever tell Patrick Lawrence that you had been harassed?

A. I didn't tell Pat because I was afraid that when Ted was confronted with this that my job would be more difficult.

. . . . .

Q. So how would telling Patrick Lawrence put your job in jeopardy?

A. Because it would be his duty as my supervisor to report any incidents of sexual harassment.

. . . . .

Q. And that's why you didn't tell him because he had a duty to report it?

A. I would have hoped that he would do his job to report it, but I did not want to tell him about it because he would report it thus putting my job in jeopardy.

Q. You didn't give him the opportunity to report it, did you?

A. No I did not.

Q. Did you ever read the Burlington Company employee handbook?

A. Yes, I did.

Q. Did you read in there that there was a companywide policy against sexual harassment?

A. Yes, I did.

Ellerth Dep. at 356–58. Ellerth attempts to distance herself from this testimony by stating in her affidavit: "While I knew there was a policy against sexual harassment in the employee handbook, I was not aware of whether it was being enforced, whether it was in effect throughout my employment, or who to complain to should I experience a problem with sexual harassment." We find this self-serving statement to be insufficient to raise a genuine issue of material fact. Burlington's employee handbook states in pertinent part:

**Equal Opportunity**

[T]he Company will not tolerate any form of sexual harassment in the workplace.

. . . . .

[I]f you have any questions or problems, or if you feel you have been discriminated against, you are encouraged to talk with your supervisor or human resources representative or use the grievance procedure promptly.

Def.'s Ex. F. Ellerth admits receiving a copy of the employee handbook and reading this policy statement. Ellerth Dep. at 358–60. If ever there was a time when she did not recall who to contact regarding the harassment she was enduring, she need only have consulted her handbook. In view of Ellerth's acknowledgment of her deliberate failure to utilize the equal employment opportunity procedures outlined in the handbook, and her failure to take any other measures to notify appropriate Burlington management personnel about her harassment,[12] she has failed to raise a genuine issue of material fact as to whether Burlington knew or should have known about Slowik's conduct. Accordingly, she cannot rely on § 219(2)(b) as a basis for imposing liability on Burlington for Slowik's conduct.

Drawing on *Hunter v. Allis–Chalmers Corp., Engine Div.,* 797 F.2d 1417 (7th Cir.1986), Ellerth argues that she need not establish that Burlington had actual knowledge of Slowik's harassment because Slowik was a manager at the decision-making level of Burlington and his acts can therefore be imputed to Burlington. In relevant part, *Hunter* states:

Since the acts of a corporation are acts of human beings, to say that the "corporation" has committed some wrong (rather than just that it is liable under the doctrine of respondeat superior for an employee's wrong) simply means that someone at the decision-making level in the corporate hierarchy has committed the wrong; the deliberate act of such a person is the corporation's deliberate act.

*Id.* at 1422. Notwithstanding the broad sweep of this language [which, we note, the Seventh Circuit has accurately described as *dicta, see Brooms v. Regal Tube Co.,* 881 F.2d 412, 420 (7th Cir.1989) [13]], we do not

12. Ellerth states that she complained about Slowik's sexual harassment to Donna Thibideau, Burlington's customer service manager between January and March of 1994; Sherry Hester, a Burlington customer service representative; Brent Schneider, a Burlington sales representative; Patrick Crosson, a Burlington sales representative; Marilyn (last name unknown), a Burlington "sample" person; Laura Peffal, a Burlington customer service representative; and Cara Jiminez, a Burlington customer. (Pl.'s Facts ¶ 46). However, Ellerth admits that none of these people were her superior, (Def.'s Facts ¶ 46), or a human resources officer in a position to file a formal complaint in accordance with Burlington's Employee Handbook grievance procedure. Ellerth completely failed to report Slowik's harassment to anyone who would have received the complaints within the scope of their authority or who would have had a duty to report Slowik's conduct. Ellerth also claims that Angelo Brenna witnessed the harassment at the New York lunch. However, even assuming for the sake of argument that Brenna's observations at that lunch would have sufficiently alerted him to the fact that Slowik was harassing Ellerth, we cannot conclude that he had a duty to report Slowik's conduct. Any knowledge that Brenna might have had cannot be imputed to Burlington, for he neither received the knowledge while acting within the scope of his authority nor witnessed anything that even remotely concerned matters within the scope of that authority. *See Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 320 (7th Cir.1992).

13. *See also Baskerville v. Culligan Int'l Co.,* 50 F.3d 428 (7th Cir.1995). In *Baskerville,* Judge Posner, who also authored *Hunter,* declined to decide whether it was correct to treat a supervi-

believe that the language was intended to have the sweeping effect that Ellerth attributes to it. The language must be read in the context of the governing agency principles. The Seventh Circuit shed some light on this passage in *Shager v. Upjohn Co.*, which we quote at length because it is critically important to understanding the proper resolution of this issue:

> Discrimination is an intentional tort and as we noted earlier an employer is liable for the intentional torts of an employee only if they are in furtherance (though possibly misguided) of the employer's business, implying some relation between the tort and the business.... [A] supervisory employee who fires a subordinate is doing the kind of thing that he is authorized to do and the wrongful intent with which he does it does not carry his behavior so far beyond the orbit of his responsibilities as to excuse the employer. Restatement (Second) of Agency § 228 (1958). From the outside, at least, it looks as if he is doing his job, which is not the case when one worker sexually harasses another; and the appearance of authority provides a rough-and-ready criterion of respondeat superior....

913 F.2d 398, 405 (1990). For purposes of this discussion, the foregoing passage is significant because it establishes that *Hunter*'s language was intended to do little more than express the general principles of scope-of-employment liability and/or liability under the apparent authority doctrine. And, notwithstanding Judge Posner's statement that "the wrongful intent with which he does it does not carry his behavior so far beyond the orbit of his responsibilities as to excuse the employer," this Court believes, as we have

endeavored above to illustrate, that an improper intent can indeed remove conduct from the scope of employment, *see* RESTATEMENT § 235 cmt. *a* and *c*. Moreover, as we stated above, we believe that the issue of whether conduct is within the scope of employment must be determined on a case by case basis with particular attention to the facts of each case. Notably, the example given by Judge Posner involved the firing of an employee *not* sexual harassment. We believe this distinction to be significant because there is likely to be a greater degree of overlap between the employer's purposes and the supervisor's discriminatory intent in the case of a discrete employment decision such as hiring and firing than in the case of creating a hostile work environment by soliciting sex from one's subordinates. What purpose of the employer is served by that conduct? None that we can discern. Additionally, although the fact that a supervisor is doing the type of act that he is authorized to do, during working hours, and at an authorized place, gives rise to an inference that the employee is acting within the scope of his employment, RESTATEMENT § 235 cmt. *a*, that inference is rebuttable. *Id.* illustration 1. Where, as here, the supervisor's conduct is not tied to any specific employment decision and the employer has a published policy prohibiting sexual harassment, we must conclude that the inference has been rebutted. And, for reasons we discuss immediately below, we also find under the present facts, that Judge Posner's comments concerning apparent authority have no force here. Accordingly, we decline to impute Slowik's conduct to Burlington merely because he has some decision-making authority.[14]

sor as the employer (hence imposing strict liability on the employer) in cases involving "an abuse of authority, as where a supervisor threatens to fire a subordinate if she refuses to have sex with him." *Id.* at 431–32.

14. Indeed, the actual extent of Slowik's decision-making authority is not open to much question. Burlington has submitted the affidavit of Slowik's superior, Salvatore V. Porio, executive vice president of Mattress Fabrics (or "Ticking"), who explains that Ticking is only one of five business units of the Burlington House Fabrics Group and the Group is only one of eight divisions of Burlington. Slowik is the vice president of Market-

ing and Sales for Ticking and reports to Porio. Porio states that he is "primarily responsible for the employment decisions affecting all employees in Ticking" and that he "approved the decision to hire and promote [Ellerth] and my signature is on the Personnel Change Form which memorializes both employment decisions." Porio Aff. ¶¶ 5, 6. Porio further states, "The position of Vice President of Marketing and Sales for Ticking held by Slowik is not considered an upper-level management position at Burlington. Further, Slowik is not amongst the decision-making or policy-making hierarchy of Burlington." *Id.* ¶ 8. On the other hand, Slowik testified in his deposition that he had ultimate decision-making

**1120**

■ The only remaining ground for imposing liability against Burlington for Slowik's conduct lies in § 219(2)(d), which subjects an employer to liability for the acts of its employees acting outside the scope of their employment where the employee "purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." RESTATEMENT § 219(2)(d).

On its face, § 219(2)(d) appears quite applicable to the instant case. Slowik certainly invoked his apparent authority when he asserted that he could make Ellerth's life at Burlington very easy or very hard, and it was precisely the existence of the agency relationship that permitted Slowik the opportunity to exploit his position of authority and harass Ellerth. However, these readings of § 219(2)(d) are too shallow and fail to adequately take into account the policy rationales underlying the rule.

With respect to the language "was aided in accomplishing the tort by the existence of the agency relation," we concur with the D.C. Circuit which observed that "[i]n a sense, a supervisor is always 'aided in accomplishing the tort by the existence of the agency' because his responsibilities provide proximity to and regular contact with, the victim," and concluded that the reach of this language was intended to be much narrower. *Gary v. Long*, 59 F.3d at 1397. The comments to § 219 and § 261 [15] confirm that a narrower reading was intended. For instance, comment *e* to § 219 notes, "Clause (d) includes primarily situations in which the principal's liability is based upon conduct which is within the apparent authority of a servant.... In other situations the servant may be able to cause harm because of his position as agent, as where a telegraph operator sends false messages purporting to come from third persons. See § 261." In turn, comment *a* to § 261 notes, "Liability is based upon the fact

that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." Thus, the language appears to be intended to reach only conduct that on its face appears to be a natural and authorized incident of the agency. *See Gary*, 59 F:3d at 1397 (concluding that § 219(2)(d) "embraces a narrower concept that holds the employer liable only if the tort was accomplished by an instrumentality, or through conduct associated with the agency status") (internal quotation marks omitted).

■ Finally, notwithstanding Slowik's invocation of his apparent authority, we conclude that § 219(2)(d) still cannot support the imposition of liability on Burlington because Ellerth was fully aware that Slowik had exceeded the bounds of his authority. Section 166 of the Restatement provides: "A person with notice of a limitation of an agent's authority cannot subject the principal to liability upon a transaction with the agent if he should know that the agent is acting improperly." Comment *a* to this section further provides: "If a person has information which would lead a reasonable man to believe that the agent is violating the orders of the principal or that the principal would not wish the agent to act under the circumstances known to the agent, he cannot subject the principal to liability." *Cf.* RESTATEMENT § 165 ("A disclosed or partially disclosed principal is subject to liability upon a contract purported to be made on his account by an agent authorized to make it for the principal's benefit, although the agent acts for his own or other improper purposes, *unless the other party has notice that the agent is not acting for the principal's benefit.*"); RESTATEMENT § 262 ("A person who would otherwise be liable to another for the misrepresentations of one

authority regarding Ellerth's promotion. Slowik Dep. at 32. And Porio's affidavit does not conflict with this statement; after all, Porio merely states that he *approved the decision*. At most, Porio's affidavit merely raises issues about the degree of Slowik's authority which are not critical to the Court's resolution of this case.

15. Section 261 provides: "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." RESTATEMENT § 261.

apparently acting for him is not relieved from liability by the fact that the servant or other agent acts entirely for his own purposes, *unless the other has notice of this.*").

As the comment to § 262 explains, the rationale for imposing liability upon principals for acts that reasonably appear to fall within the scope of the agency is that: "A person relying upon the appearance of agency knows that the apparent agent is not authorized to act except for the benefit of the principal. This is something, however, which he cannot normally ascertain and something, therefore, for which it is rational to require the principal, rather than the other party, to bear the risk." RESTATEMENT § 262, cmt. *a.* Where, as here, an employer has published an explicit policy statement that prohibits sexual harassment, the employee has acknowledged receipt of the statement and has read the statement, and the employee is fully aware that her supervisor is engaging in unauthorized harassment, there is *no sound reason* in agency law or policy to require the employer to bear the risk of this conduct. To the contrary, under these circumstances, § 166 governs and forecloses the imposition of liability on the employer. *See Jansen,* 895 F.Supp. at 1066–67; *see also Gary,* 59 F.3d at 1398 (finding that an employer's policy insulated it from liability and noting "[w]hile a supervisor might purport to act or speak on behalf of the employer, there can be no liability if the victim could not reasonably rely on the supervisor's representations."); *Bouton,* 29 F.3d at 109–10 (requiring the employee's belief in a supervisor's apparent authority to be reasonable and finding that an antidiscrimination policy known to employees eradicates apparent authority). Accordingly, we conclude that § 219(2)(d) cannot support the imposition of liability on Burlington for Slowik's conduct.

■ One final issue with respect to Burlington's liability for Slowik's conduct, which we believe to be one of first impression, merits consideration. As this Court noted above, the hostile work environment to which Ellerth was subjected was created and maintained, in part, by Slowik's *quid pro quo* insinuations. *Quid pro quo* harassment, unlike hostile work environment harassment, has generally been treated as giving rise to strict liability on the part of the employer. *See, e.g., Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 185–86 (6th Cir.1992) ("Under a *quid pro quo* theory of sexual harassment, an employer is held strictly liable ... under a theory of respondeat superior"); *Karibian v. Columbia Univ.,* 14 F.3d 773, 777 (2d Cir. 1994) ("the law imposes strict liability on the employer for *quid pro quo* harassment"). Thus, we must consider whether the strict liability standard should apply in a case such as this where there is a *quid pro quo* component to the hostile work environment.

At the outset, we note that neither the doctrinal basis, nor the propriety, of applying strict liability in the context of *quid pro quo* harassment is entirely clear. Recently, in *Baskerville v. Culligan Int'l Co.,* the Seventh Circuit intimated that the propriety of the strict liability standard may be open to question when it remarked:

An employer is not strictly liable for sexual harassment of one employee by another unless perhaps, the harassment takes the form ... of an abuse of authority as where a supervisor threatens to fire a subordinate if she refuses to have sex with him. In such cases, a number of courts treat the supervisor as the employer ... whether correctly or not we need not decide. (Neither the Supreme Court nor our court has had occasion to decide the question.) In all other cases, it is clear, the criterion for when an employer is liable for sexual harassment is negligence....

50 F.3d 428, 431–32 (7th Cir.1995).

Indeed, there is no clear reason why the employer's liability in the context of *quid pro quo* harassment ought not to be determined by the same agency principles as those applied in the hostile work environment variant of harassment. When *quid pro quo* harassment is analyzed under the same principles outlined above, strict employer liability is not by any means compelled.

Several courts that have treated *quid pro quo* harassment as giving rise to strict employer liability have indicated that the liability is predicated on the fact that the supervisor's conduct is within the scope of the employment relation or apparent authority

of the supervisor. A representative example is as follows:

> In a *quid pro quo* case, the corporate defendant is strictly liable for the supervisor's harassment.... This is logical. When a supervisor requires sexual favors as *quid pro quo* for job benefits, the supervisor, by definition, acts as the company.
>
> In such a case, the supervisor relies upon his apparent or actual authority to extort sexual consideration from an employee.... In that case, the supervisor uses the means furnished to him by the employer to accomplish the prohibited purpose. He acts within the scope of his actual or apparent authority to hire, fire, discipline, or promote.

*Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir.1989). *See also Bouton v. BMW of N. Am.*, 29 F.3d 103, 106–107 (3d Cir.1994) ("Scope-of-employment liability is often invoked in *quid pro quo* cases because the supervisor has used his authority over the employee's job to extort sexual favors. Without the agency relationship, *quid pro quo* harassment would be impossible, so the employer is responsible."); *Karibian*, 14 F.3d at 777 ("Because the *quid pro quo* harasser, by definition, wields the employer's authority to alter the terms and conditions of employment—either actually or apparently—the law imposes strict liability on the employer"). However, this view is difficult to sustain when the agency principles set out earlier in this opinion are applied in a similar fashion.

The Seventh Circuit has characterized *quid pro quo* harassment as "exactly the situation where a supervisor's only motivation is to have a conjugal relationship with the employee." *King v. Board of Regents of the Univ. Of Wisconsin Sys.*, 898 F.2d 533, 539 (7th Cir.1990); *see also Horn v. Duke Homes, Division of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 604 (7th Cir.1985) (noting that imposing sexual consideration as a term of employment "serves no legitimate purpose of the employer"). In view of these characterizations, and applying the principles of Restatement § 219(1) outlined above, it would appear that *quid pro quo* harassment generally *would not* be found to fall within the scope of the supervisor's employment because it is not actuated by a purpose to serve the master. *See* RESTATEMENT § 228(2); *but see Horn*, 755 F.2d at 604 (applying respondeat superior liability notwithstanding the fact that the conduct served no legitimate purpose of the employer).[16] Similarly, for the reasons discussed above, in a factual situation such as that presented by the instant case in which the harassed employee is well aware of the employer's policy prohibiting sexual harassment, that employee possesses facts that would give her reason to know that the supervisor's *quid pro quo* harassment is not within the scope of his authorized conduct and therefore the employee could not hold the employer liable under the principles of apparent authority embodied in Restatement § 219(2)(d). Thus, the negligence standard of § 219(2)(b) remains the only viable avenue under traditional agency principles for imposing liability on the employer under these facts even in the context of *quid pro quo* harassment.[17]

---

**16.** *Horn* predates *Meritor* and it is unclear whether the strict liability approach articulated in *Horn* survives *Meritor*. Perhaps because it predates *Meritor*, the *Horn* court did not discuss the supervisor's imposition of sexual consideration as a term of employment as *quid pro quo* harassment; rather it analyzed the case as one involving a disparate employment decision taken on the basis of sex—in fact, on several occasions the court indicated that different principles might apply in the sexual harassment context. However, subsequent Seventh Circuit cases, *see King v. Board of Regents of the Univ. Of Wisconsin Sys.*, 898 F.2d 533, 539 (7th Cir.1990), have referred to *Horn* as involving *quid pro quo* harassment. Significant to this discussion, we note that the *Horn* court may have recognized the doctrinal limitations of agency principles for supporting strict liability when it remarked, "whatever the result under the common law of agency, Title VII demands that employers be strictly liable for the discriminatory employment decisions of their supervisory personnel who are delegated the power to make such employment decisions." 755 F.2d at 605. We believe that *Meritor* leaves little room to apply anything but agency principles when evaluating employer liability in the sexual harassment context.

**17.** Arguably, as noted in *Jansen*, 895 F.Supp. at 1064, there may be instances where it might be fair to impute knowledge of the harassment to the employer because the harassment is effectuated by one who is in "the upper echelons of management." In the instant case, Despite his

■ The foregoing remarks demonstrate that there appears to be doctrinal inconsistency in imposing strict liability on an employer in the context of *quid pro quo* harassment but not in hostile work environment harassment and, hence, that the propriety of the strict liability standard is open to some question. Perhaps that is why the Seventh Circuit flagged the issue in *Baskerville*. Of course, Ellerth does not purport to base her claim on a *quid pro quo* theory; thus, we will postpone deciding the question of whether the strict liability standard is sustainable until it is more squarely presented to the Court. Our segue into this question was occasioned, of course, because the narrower question actually before us—*viz.*, whether to apply the *quid pro quo* standard in a hostile work environment context wherein the hostile environment was created, in part, by *quid pro quo* insinuations—is immaterial unless the *quid pro quo* standard is, in fact, different from the hostile work environment standard. However, under the facts of this case, we conclude that although the *quid pro quo* element of Ellerth's hostile environment is not insubstantial, the gravamen of her complaint is, by far, predicated on Slowik's persistent unwelcome comments of a sexual nature, his repeated comments about her body (including her breasts, legs and "ass"), his lecherous leering, and offensive touching. Accordingly, we believe that the negligence standard generally applicable to hostile environment harassment is more applicable to this case. To apply a *quid pro quo* standard under these facts would amount to the tail wagging the dog. Moreover, to apply a *quid pro quo* strict liability standard here merely because there is some element of *quid pro quo* harassment contributing to Ellerth's hostile environment strikes the court as manifestly unjust under the facts presented. It is undisputed that Burlington had a sexual harassment policy and a mechanism for addressing harassment in place. Ellerth was fully aware of the policy and consciously chose to disregard it. Under these facts, there is simply no just reason to impose strict liability on Burlington for the hostile environment created by Slowik.

For all of the foregoing reasons, under the facts presented by this case, we conclude that Burlington cannot be held liable for Slowik's conduct and is therefore entitled to judgment as a matter of law on Ellerth's Title VII claim.

Before moving on to consider Ellerth's second claim, the Court is impelled to make the following remarks concerning the unfortunate facts and outcome of this case. Needless to say, the facts of this case are unfortunate because no person should have to endure the objectification and humiliation that Ellerth was allegedly forced to endure at the hands of Slowik. They are also unfortunate, as with so many of these cases, because they strikingly illustrate that in spite of whatever social enlightenment our nation might have achieved in the wake of the civil rights movement, the various antidiscrimination laws enacted by Congress, and such consciousness raising events in our nation's history as the Anita Hill/Clarence Thomas hearings, the nation's workplaces are still filled with those who are all to eager to exploit their positions of authority and act motivated by discriminatory animus. And, they are also unfortunate because they so plainly demonstrate, by virtue of Ellerth's reluctance to come forward, the effects that systematic oppression has on its victims. The outcome is unfortunate in the sense that Slowik, if Ellerth's allegations are true, is able to walk away from this episode unscathed and Ellerth unable to recover. We, like so many others, envisioned this outcome in *Jendusa v. Cancer Treatment Centers of Am., Inc.*, 868 F.Supp. 1006, 1013 n. 9 (1994), and now see the effect of the judicial determination that Title VII does not permit recovery against supervisors in their individual capacities. *See U.S. E.E.O.C. v. AIC Security Investigations, Ltd.*, 55 F.3d 1276 (7th Cir.1995). This Court cannot believe that this outcome was the one envisioned by Congress when enacting Title VII. *See Lynam*

---

title and position as vice president of sales and marketing of the House Mattress Ticking division, the uncontroverted evidence indicates that Slowik cannot be considered to be at the upper echelons of Burlington's management. The affidavit submitted by Porio, indicates that … Accordingly, we are unwilling to conclude that Burlington had knowledge.

**1124**

*v. Foot First Podiatry Centers, P.C.,* 886 F.Supp. 1443, 1446 (N.D.Ill.1995).

*Constructive Discharge*

■■■■ Ellerth also contends that she was constructively discharged by Burlington as a result of Slowik's conduct. "An employer constructively discharges an employee only if it makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Weihaupt v. American Med. Ass'n,* 874 F.2d 419, 426 (7th Cir.1989). As discussed at length above, Slowik's conduct cannot be imputed to Burlington and Burlington was not negligent in failing to respond to the harassment suffered by Ellerth. Ellerth never reported the harassment. Moreover, nothing in the record suggests that Burlington otherwise treated the plaintiff poorly, let alone intolerably. Burlington provided a grievance procedure for sexual harassment and Ellerth was apprised of Burlington's prohibition against sexual harassment. Ellerth adduced no evidence suggesting that had she properly complained about her harassment her complaints would have gone unheeded or would have been otherwise futile. Ellerth consciously chose not to use Burlington's grievance procedure; therefore, it can not be said that Burlington made Ellerth's working conditions intolerable forcing her into an involuntary resignation. Plainly, when an employer provides an avenue for relief from sexual harassment and an employee chooses to forego that avenue, she cannot be heard to complain that she was constructively discharged by virtue of the harassment. Accordingly, Burlington is entitled to judgment as a matter of law as to Ellerth's constructive discharge claim.

*CONCLUSION*

Defendant Burlington Industries, Inc.'s motion for summary judgment in its favor is granted in its entirety. Judgment is hereby entered in favor of Burlington and against plaintiff Kimberly Ellerth. This action is dismissed with prejudice, both sides to bear their own costs.