Kimberly B. **ELLERTH,**
Plaintiff–Appellant,

v.

**BURLINGTON INDUSTRIES, INC., Defendant–Appellee.**

No. 96–1361.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1996.

Decided Nov. 27, 1996 *.

Rehearing and Rehearing En Banc Granted, and Decision Vacated Jan. 28, 1997.**

---

** The Honorable Kenneth F. Ripple did not partic-ipate in the consideration of the suggestion for rehearing en banc.

Ernest T. Rossiello, Margaret A. Zuleger, and Elena M. Dimopoulos (argued), Rossiello & Associates, Chicago, IL, for Plaintiff–Appellant.

Jeffrey J. Ward, Keck, Mahin & Cate; James J. Casey (argued), and Mary M. Moore, Ross & Hardies, Chicago, IL, for Defendant–Appellee.

Gwendolyn Young Reams, Susan Starr (argued), Carolyn L. Wheeler, Mary L. Clark, and C. Gregory Stewart, Equal Employment Opportunity Commission, Washington, DC, for Amicus Curiae.

Before BAUER, ROVNER, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Kimberly Ellerth's lawsuit against Burlington Industries, which claimed that a higher level supervisor sexually harassed her, foundered on the rules for holding a company liable for its supervisory employees' conduct in this area. Expressing some frustration with the inadequacy of the theoretical framework available, the district court concluded that Burlington was not liable under any of the theories of agency law that Ellerth proffered. We agree with the district court that the rules governing supervisory liability in both *quid pro quo* and hostile work environment sexual harassment cases have been less than clear. Applying the agency principles that the Supreme Court instructed us to use in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), we conclude that Ellerth presented enough facts to survive summary judgment.

I

In March 1993, Ellerth interviewed for a marketing job at Burlington with Mary Strenk Fitzgerald, a National Accounts Manager in the Mattress Ticking Division. This conversation went well, and Ellerth was invited back for a second interview with Theodore Slowik, the Vice President of Sales and Marketing for the Mattress Ticking Division. From Ellerth's perspective, which we take on this appeal from an adverse grant of summary judgment, the initial encounter with Slowik was disturbing. Among other questions, he asked her if she and her husband were planning on having a family and "practicing" at it, and he stared conspicuously at her breasts and legs. About a week after this interview, Burlington offered and Ellerth accepted the position of Merchandising Assistant in its Chicago office. She reported to Fitzgerald, who in turn reported to Slowik. Fitzgerald and Ellerth were the only two employees in the Chicago office.

Given the management structure, Ellerth saw (and was required to see) Slowik on a regular basis. Although Slowik was based in New York, he came to the Chicago office one or two days every month or two. Occasionally Ellerth saw him in Greensboro, North Carolina, at Burlington's corporate office and manufacturing headquarters, or on training trips to New York and San Francisco. Even when she did not see him in person, her job caused her to speak with him on the telephone about once a week.

Ellerth's encounters with Slowik, both verbal and direct, were characterized by a constant barrage of sexual comments, innuendo, and occasionally more. In the summer of 1993, for example, she traveled to New York

for a week of training. Before that trip, Slowik had telephoned Ellerth and spoken suggestively to her. While there, she had several conversations with him, two of which were prolonged. The first of those took place in Slowik's office, during which he told Ellerth a number of off-color, offensive jokes. The second took place over a business lunch that included Ellerth, Slowik, and Angelo Brenna, Burlington's Vice President of International Sales. Slowik again told a number of sexually offensive jokes and rubbed Ellerth's knee under the table. She pulled her leg away when he touched it. When the three left the restaurant, Slowik and the other Vice President walked several feet behind Ellerth, and Slowik commented, "You have got great legs, Kim" and then, to Brenna, "What do you think, Angelo?" When they returned to the office, Ellerth reported to two other Burlington workers that Slowik and Brenna had been loud, obnoxious, rude, and offensive at the lunch.

Slowik continued making sexually offensive comments when Ellerth was with him, both about her and about other women. After a business dinner in Greensboro, Slowik invited Ellerth to join him at the lounge of the hotel where they were both staying, and she felt obliged to accept. At the lounge, Slowik commented that the female band members had nice breasts, nice legs, and nice, skimpy outfits. Looking at Ellerth's breasts, he then said, "You are a little lacking in that area, aren't you Kim?" When she did not respond, Slowik told her that she "ought to loosen up," and stared at her chest and legs. Upon leaving the lounge, Slowik's remark was more threatening: "You know, Kim, I could make your job very hard or very easy at Burlington." Ellerth interpreted this to mean that she would have to have sex with Slowik to succeed at the company.

After the Greensboro trip, Slowik began telephoning Ellerth more frequently. The calls, though brief, normally included sexually harassing comments. Slowik would talk about her body (particularly her legs) and would ask about her "practice" to have a family. On several occasions, he refused to give Ellerth special permission to do something for a customer until she described her

clothing to him. He suggested that her job would be much easier if she wore shorter skirts. Ellerth testified that "every time I was on the phone with him I ended up most—in tears." The same kind of conduct continued when he saw her personally. In the fall of 1993, on a visit to the Chicago office, Slowik encountered Ellerth on the floor where she was folding samples. In front of another employee, he said, "on your knees again, Kim," implying (falsely) that she would "again" perform fellatio.

Ellerth's resistance to Slowik's overtures did not deter him. In February and March 1994, Ellerth interviewed with Patrick Lawrence (who also reported to Slowik) and Slowik for a promotion to the position of Sales Representative for the Midwest territory. Slowik, who had final decisionmaking responsibility for the promotion, rubbed her knee with his hand during the interview for the promotion while asking her whether the frequent travel associated with the new position would make her husband miss her. Patrick Crosson, the person who had held that position previously, told Ellerth before her interview that Slowik had said he did not want to promote her because she was "arrogant." Lawrence reported the same thing. When Ellerth confronted Slowik about this, he admitted calling her arrogant and said, "I have my hesitations having you in this position." Ellerth asked, "[I]s it because I'm not loose enough for you, Ted?", and Slowik replied in the affirmative. Some two weeks later, Slowik called Ellerth to tell her she had received the promotion, but he added a sexually inappropriate comment to her at the end of the conversation that made her start crying.

In addition to Ellerth's complaints about Slowik to the workers in the New York office, and to Vice President Brenna's direct observation of Slowik's behavior, Ellerth also complained in early 1994 to Donna Thibideau, Burlington's Customer Service Manager, that Slowik was sexually harassing her. Thibideau (who held a higher level position than Ellerth) told her that Slowik also may have harassed Ann Pillow, another Burlington employee. Ellerth also complained to Sherry Hester, a Customer Service Repre-

sentative, to Brett Schneider, a Sales Representative, and to several customers. On at least one occasion between her hire date and the fall of 1993 she complained directly to Slowik about his behavior.

In May 1994, Ellerth and her new supervisor, Lawrence, met to discuss ways in which they could improve office procedures. Lawrence accepted some of Ellerth's suggestions; he made no mention of any customer complaints about her performance, including about her returning telephone calls. Shortly thereafter, Lawrence and Thibideau received one or two such complaints, which prompted a letter on May 22, 1994, from Lawrence to Ellerth about her failure to return calls from two customers and three Burlington employees. The letter referred to a May 18, 1994, conversation between Lawrence and Ellerth, which Ellerth contends did not take place.

On May 31, 1994, Ellerth left a message on Lawrence's answering machine telling him that she was quitting, and she faxed him a letter to the same effect. The original letter that she wrote included references to Slowik's harassment of her: "What I did not want to mention to you was the fact that Ted had harassed me in the past and I simply ignored him to save my job;" "[n]eedless to say these incidents could be seen as sexual harassment;" and "[w]hat a shame that one man can have such an influence." At the advice of her husband, and knowing that Slowik was Lawrence's supervisor, she covered up those sentences with correction fluid before sending the fax, which she transmitted in a form that showed the blank spaces from the redaction. Three weeks later, she sent Lawrence a more complete explanation, in a letter dated June 21 that said in part:

> Before I was hired, you and I spoke about the reasons why Ted didn't feel comfortable around me. I told you he had said and done some sexually inappropriate things to me in the past. What I didn't tell you was that he had on two occasions, patted my rear and every time he saw me looked me up and down like a piece of meat....

Although Ellerth knew that Burlington had a policy against sexual harassment, she was unaware of how vigorously it was enforced, and both she and her husband feared that her job would be jeopardized if she complained more than she already had.

Burlington's policy against sexual harassment was in force throughout the time Ellerth was employed there. It stated that "[t]he company will not tolerate any form of sexual harassment in the workplace.... If you have any questions or problems, or if you feel you have been discriminated against, you are encouraged to talk to your supervisor or human resources representative or use the grievance procedure promptly." It is undisputed that Ellerth did not use the grievance procedure or complain to her direct supervisor (as opposed to Slowik himself).

## II

On October 12, 1994, Ellerth filed a charge of sexual harassment with the Illinois Department of Human Rights (IDHR) and with the Equal Employment Opportunity Commission (EEOC). Her complaint alleged that:

> On numerous occasions, since in or about March 1993, I was sexually harassed by ... TED SLOWIK. On several occasions, including on or about March 15, 1994, SLOWIK rubbed my knee in an offensive and unwelcome manner. SLOWIK also made numerous comments to me about my legs, breasts and physical appearance, including on or about May 1, 1994, when he told me I had great legs and should wear shorter skirts. SLOWIK also made a comment to me, on or about October 1, 1993, about me being on my knees "again."

She alleged as the latest date of discrimination May 30, 1994, which was when she felt "compelled to resign ... due to continued the [sic] hostile offensive and abusive work environment created by SLOWIK's sexual harassment and my opposition to sexual harassment by SLOWIK." The EEOC issued a right to sue letter on November 30, 1994, and this suit followed.

Ellerth's complaint in the district court alleged both sex discrimination (in the form of sexual harassment) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and constructive discharge in violation of Title VII. See *Ellerth v. Burling-*

*ton Indus.*, 912 F.Supp. 1101 (N.D.Ill.1996). Although the district court's opinion analyzed the case as one involving the "hostile work environment" variety of sexual harassment, the court noted that "imbedded in Slowik's harassment of Ellerth is a *quid pro quo* proposition," referring to Slowik's threat "I could make life very hard for you." *Id.* at 1114. Nonetheless, the court thought the complaint's failure explicitly to allege the *quid pro quo* theory prevented it from using that theory as a ground of recovery. *Id.* at 1114–15 n. 10.

Burlington argued before the district court that Ellerth's complaint was untimely as to all conduct occurring before December 20, 1993, the date 300 days before she filed her complaints with the IDHR and the EEOC. Finding that Ellerth was aware of the discriminatory nature of Slowik's conduct from the outset, the district court agreed that "by the summer of 1993, Slowik's discriminatory conduct had the degree of permanence that should have triggered Ellerth's awareness of and duty to assert her rights." *Id.* at 1113. Nonetheless, the court found that evidence of pre-December 10, 1993, conduct was relevant to the consideration whether Ellerth was subjected to an actionable hostile work environment. In that light, it found that Ellerth had raised a genuine issue of material fact on the hostile work environment issue. The court specifically found that Slowik's March 1994 conduct, rubbing Ellerth's knee during the promotional interview, "could be regarded as reinforcing Slowik's previous persistent implicit messages to her that her value was as a sex object and that her growth in the company was dependent upon her sexual availability to him." *Id.* at 1114.

The critical issue in the case therefore became whether Burlington was liable for Slowik's conduct. The district court noted that *Meritor* requires courts to look to agency principles when evaluating whether employers should be held liable for sexual harassment by their supervisors. It first considered whether Slowik's harassment was committed within the scope of his employment, as that term is used in the Restatement (2d) of Agency § 219(1) (1958). Looking at the factors listed in the Restatement

(2d) § 228(1)(c) and at § 235, the court concluded that Slowik's conduct was not motivated to serve Burlington and thus that it could not be considered as falling within the scope of his employment. The court then turned to § 219(2), which sets forth various theories under which an employer might be liable for acts of its employees acting *outside* the scope of their employment. It found that Ellerth could not use § 219(2)(b), which applies where the employer was negligent or reckless, because her failure to use Burlington's sexual harassment remedies or to take other measures to notify Burlington meant that she could not show that Burlington knew or should have known about Slowik's conduct. The court held that Slowik's position as manager did not mean that his acts could automatically be imputed to Burlington. Finally, the court rejected liability under § 219(2)(d) of the Restatement, which subjects an employer to liability when the employee exercises apparent authority or is aided in accomplishing the tort by means of the agency relation. This language, it thought, reaches only conduct that on its face appears to be a natural and authorized incident of the agency. Here, Ellerth was aware that Slowik was exceeding his authority. Recharacterizing the case as a *quid pro quo* action or as constructive discharge was also unavailing for Ellerth. The district court therefore granted summary judgment for Burlington and dismissed all of Ellerth's claims.

### III

Before this Court, Ellerth raises two principal claims: first, she asserts that her complaint (both before the EEOC and in the district court) was sufficiently broad to encompass the *quid pro quo* theory, and second, she argues that the district court erred as a matter of law in its analysis of the agency principles applicable to her case. We address the procedural question first, and then consider the issue of supervisory liability under both theories of harassment.

### A.

■ The district court construed Ellerth's complaint as one invoking only the hostile work environment theory of sexual harass-

ment, although its opinion acknowledges that her allegations brought to mind *quid pro quo* harassment as well. On appeal, Burlington urges us to take the same approach. It portrays her *quid pro quo* theory as an afterthought, developed only in the course of discovery and not stressed until her briefs before this Court. Ellerth, for her part, argues that her complaint met the liberal standards of Fed.R.Civ.P. 8(a)(2) and that particularized pleading of sub-theories of sexual harassment (itself a subset of the sex discrimination prohibited by Title VII) is not required by the rule.

■ In our view, Ellerth has the better of this argument. Her charge with the EEOC alleged that Slowik had sexually harassed her and concluded with the complaint that she had been "compelled to resign ... due to [the continued] hostile offensive and abusive work environment created by SLOWIK's harassment *and my opposition to sexual harassment by SLOWIK.*" (Emphasis added.) Her complaint in the district court alleged simply that she was "inappropriately touched and sexually harassed in her place of employment." The distinction between hostile environment and *quid pro quo* sexual harassment is an analytical one, rather than one based on statutory language. Indeed, it would be a mistake to think that there is a bright line between the two kinds of situations, as Ellerth's own case illustrates. The same actions that create a hostile environment may have overtones of *quid pro quo* demands, and a person suffering from *quid pro quo* harassment is also enduring a hostile environment. Whatever utility the distinction may have in the factual and legal development of a case, there is no requirement that EEOC charges or Title VII complaints plead the particular theory of harassment that the complainant wishes to pursue. See *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir.1996); *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir.1992). Ellerth's complaints, coupled with the supporting materials she submitted to the district court, brought forward the facts tending to show *quid pro quo* as well as hostile environment harassment, and the court's extensive discussion of the quid pro quo theory shows that it recognized its potential applicability.

Ellerth was entitled to have her allegations tested under both approaches, both in the district court and here, on our *de novo* review of the district court's summary judgment ruling.

### B.

■■ As this Court recently noted in *Bryson v. Chicago State University*, 96 F.3d 912 (7th Cir.1996), *quid pro quo* harassment "occurs in situations where submission to sexual demands is made a condition of tangible employment benefits." *Id.* at 915. See also *Bristow v. Drake St. Inc.*, 41 F.3d 345, 353–54 (7th Cir.1994); *Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456, 461 (7th Cir.1990); *King v. Board of Regents of the Univ. of Wis. Sys.*, 898 F.2d 533, 539 (7th Cir.1990); *Saxton v. American Tel. and Tel. Co.*, 785 F.Supp. 760, 764 (N.D.Ill.1992), aff'd, 10 F.3d 526 (7th Cir.1993). The initial question for us is therefore whether Ellerth's allegations and the materials she presented in opposition to Burlington's motion for summary judgment raised a genuine issue of fact on her *quid pro quo* theory. We conclude that they did. On a number of occasions, this evidence indicates that Slowik refused to give Ellerth special permission for work projects until she described her physical appearance to him. Interpreted in the light of his earlier comment that he "could make [her] job very hard or very easy at Burlington," a jury could find that she had to play the role of sex object in order to obtain desirable work assignments. The numerous incidents in which Slowik withheld permission for work assignments until she satisfied his demands could, if believed by a factfinder, support a finding that the harassment occurred. In addition, the district court found, and we agree, that Ellerth came forward with enough evidence to support a factual finding of hostile work environment.

### C.

We therefore turn to the question which is central to both the *quid pro quo* claims and the hostile environment claims: whether Burlington is liable for Slowik's actions under the rules for employer liability established in

*Meritor and Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In 1986, the Supreme Court confirmed in *Meritor* that sexual harassment is a form of sex discrimination prohibited by Title VII. After holding that actionable harassment could exist if it were sufficiently severe or pervasive to alter the conditions of employment, the Court turned to the question of the employer's liability for its supervisor's actions. As in our case, the employer in *Meritor* had not been given notice of the supervisor's alleged conduct. After discussing the parties' respective positions on the question, the Court commented that the debate had "a rather abstract quality about it given the state of the record in this case." 477 U.S. at 72, 106 S.Ct. at 2408. Rather than issuing a definitive rule on employer liability, the Court instead stated only that it agreed with the EEOC:

> that Congress wanted courts to look to agency principles for guidance in this area. While such common-law principles may not be transferable in all their particulars to Title VII, Congress' decision to define "employer" to include any "agent" of an employer, 42 U.S.C. § 2000e(b), surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible. For this reason, we hold that the Court of Appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisors. See generally Restatement (Second) of Agency §§ 219–237 (1958). For the same reason, *absence of notice* to an employer does *not necessarily insulate* that employer from liability.

*Id.* (Emphasis added.) Importantly, the Court rejected the employer's argument that "the mere existence of a grievance procedure and a policy against discrimination, coupled with [the employee's] failure to invoke that procedure," insulated it from liability. *Id.* It concluded that the Court of Appeals had been wrong "to entirely disregard agency principles and impose *absolute* liability on employers for the acts of their supervisors, regardless of the circumstances of a particular case." *Id.* at 73, 106 S.Ct. at 2408 (emphasis added).

*Meritor* thus rejected both the extreme view that employers are "automatically" or "absolutely" liable for the actions of their supervisory personnel, and the extreme view that the mere existence of a grievance procedure and a policy against discrimination is enough to insulate the employer from liability. Notably, the Court phrased its discussion in terms of what Title VII required, implying that it was not creating a rule specific to sexual harassment cases but instead was construing the statute as a whole to require reference to agency principles. We must decide, therefore, whether Ellerth presented enough to defeat summary judgment for Burlington on the ground that agency principles themselves show that it is not liable for Slowik's actions. This is the first occasion since *Meritor* that this court has been required to consider the problem of sexual harassment by supervisors in this light. We begin, as *Meritor* instructs, by consulting basic agency law.

### D.

The Restatement (2d) of Agency, § 219 ("Second Restatement"), sets forth the general rules for when a master is liable for the torts of his servants. The rules of agency apply with equal force when the relationship is one of master and servant, because a servant is merely "an agent of a special kind, over whose physical acts the principal has control or the right to control." *Id.* § 25, cmt. a. Because it is critical to our analysis, it is worth setting forth the language of § 219 in full:

> (1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
>
> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
> (a) the master intended the conduct or the consequences, or
>
> (b) the master was negligent or reckless, or
>
> (c) the conduct violated a non-delegable duty of the master, or
>
> (d) the servant purported to act or to speak on behalf of the principal and

there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

The parties have focused most of their arguments on § 219(2)(d), to which we turn in time, but like the district court we begin with § 219(1), which holds the key to supervisory liability in many of these cases.

The critical question here, as in most agency cases, is the meaning of the phrase "acting in the scope of their employment." Few concepts have a longer history in the law of agency. Thus, for example, Justice Joseph Story wrote in his Commentaries on the Law of Agency (5th ed. 1857) ("Story on Agency") that a principal:

> is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances, or misfeasances, and omissions of duty, of his agent, in the course of his employment, although the principal did not authorize, or justify, or participate in, or, indeed, know of such misconduct, or even if he forbade the acts, or disapproved of them.

Story on Agency, § 452, at 536–37. In these cases, Story explained, "the principal holds out his agent, as competent, and fit to be trusted; and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency." *Id.* at 537. For matters outside the scope of the agency, Story wrote that the principal would not be liable unless he had expressly authorized the acts to be done, or he subsequently adopted them for his own use or benefit. *Id.* § 456, at 587. See also Floyd R. Mechem, The Law of Agency § 732, at 562 (1889) ("the agent's act is the act of the principal, and whatever injuries may result to third persons, from the manner in which the act is performed, are properly attributable to the principal").

The English treatise on The Law of Master and Servant by Francis Raleigh Batt (J. Crossley Vaines ed. 1950) ("Batt on Master and Servant") throws some light on the traditional way of determining exactly what falls within the scope of employment. Batt wrote that "[a] master is liable for the wrongful act of his servant when it arises out of the performance of the servant's duties of service or when it is effected by the servant exercising the authority by which the contract of service endows him." *Id.* at 254. This excludes cases where the servant is engaged on business of his own and the wrongful act was unconnected with the master or his affairs. John W. Salmond's Treatise on the Law of Torts (1907) ("Salmond on Torts") is similar, stating that an act is done in the course of employment if it is either "(a) a wrongful act authorised by the master, or (b) a wrongful and unauthorised mode of doing some act authorized by the master." *Id.* § 29, at 83. Quoting from the Court of Exchequer Chamber in *Barwick v. English Joint Stock Bank*, (1867) L.R. 2 Ex. 259 at 266, Salmond noted that "[i]n all these cases ... it may be said that the master has not authorized the act. It is true he has not authorized the particular act, but he has put the agent in his place to do that class of acts, and he must be answerable for the manner in which the agent has conducted himself in doing the business which it was the act of his master to place him in." Salmond on Torts at 84. Early Supreme Court cases reflect the same principles. See *Philadelphia and Reading R.R. Co. v. Derby*, 55 U.S. 468, 14 How. 468, 14 L.Ed. 502 (1852) (railroad company liable for train accident although conductor acted contrary to express instruction of dispatcher) (citing Story on Agency § 452 and others); *New Orleans, M. & C. Railroad Co. v. Hanning*, 15 Wall. 649, 82 U.S. 649, 657, 21 L.Ed. 220 (1872) (railroad company liable for injuries caused by agent's negligent rebuilding of wharf) (citing Story on Agency § 452); *Singer Mfg. Co. v. Rahn*, 132 U.S. 518, 522–23, 10 S.Ct. 175, 176–77, 33 L.Ed. 440 (1889) (sewing machine company liable for carriage accident caused by employee driving wagon furnished by company and under exclusive contract with company).

Both the First Restatement of Agency (1933) and the Second Restatement carry forward these principles. In general, according to the Second Restatement § 228, conduct of a servant is within the scope of employment if and only if (a) it is of the kind he is employed to perform, (b) it occurs substantially within the authorized time and

space limits, (c) it is actuated, at least in part, by a purpose to serve the master, and (d) if force is intentionally used by the servant against another, the use of force is "not unexpectable" by the master. Section 229 sets forth no less than ten factors that are helpful in determining whether or not conduct, "although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment." Second Restatement, § 229(2). Comment a explains that "[s]ince the phrase 'scope of employment,' is used for the purpose of determining the liability of the master for the conduct of servants, the ultimate question is whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business in which the servant is employed."

Reflecting no material change from the 19th–century authorities, the Second Restatement endorses the rule that the mere fact that an employer has forbidden his servant to do something, or to accomplish a task in a particular way, is not enough to defeat a finding that the act was within the scope of employment. See *id.* § 230. This rule holds even if the employer has specifically forbidden the employee to do the act in question. Criminal or tortious acts can be found to be within the scope of employment, as § 231 describes at some length. Conduct is not for the purpose of serving a master only if it is done with no intention to perform it either as a part of, or incident to, a service for which the servant is employed. § 235. If the servant's motives are mixed, his actions may still be within the scope of his employment. § 235, cmt. b; § 236. The specific examples in the text of torts of the servant for which the master may be liable, such as liability for physical harm caused by the negligent conduct of the servant acting within the scope of employment (sec. 243), the use of force if it is predictable (sec. 245), and defamation (sec. 246), all are based on this general principle.

In all of these cases, the court focuses on whether the employer had the right to control the servant's actions at the time of the tortious occurrence, not on whether it expressly authorized the tort itself. It is plain that a principal would not instruct or authorize an agent to perform tasks negligently, or fraudulently, or in a manner harmful to others, but a finding that conduct was negligent, fraudulent, or harmful does not defeat a conclusion that it was within the scope of employment.

General agency cases help to illustrate the appropriate level of specificity in evaluating the scope of employment question. See, *e.g.*, *Standard Oil v. Parkinson,* 152 F. 681 (8th Cir.1907) (oil company liable for death of railroad engineer caused by driver negligently crossing railroad with company's wagon, oil and gasoline); *Metzler v. Layton,* 373 Ill. 88, 25 N.E.2d 60 (1939) (accidental shooting of coworker during bank robbery was so connected with other acts within scope of bank manager's employment that whether he acted within scope of employment was a jury question); *Darner v. Colby,* 375 Ill. 558, 31 N.E.2d 950 (1941) (the test is the employer's right to control the method of doing and not the fact of actual interference with it). In *Fields v. Sanders,* 29 Cal.2d 834, 180 P.2d 684 (1947), Sanders, an employee of Krieger Oil Company, assaulted Fields, another motorist, immediately after a collision between their respective vehicles. The California Supreme Court found on the undisputed facts that Sanders was acting within the scope of his employment. It held that the "inquiry is not whether the wrongful act itself was authorized but whether it was committed in the course of a series of acts of the agent which were authorized by the principal." *Id.,* 180 P.2d at 688. Where that test is met, the principal is responsible for the agent's actions "even though they be contrary to the principal's explicit instructions or otherwise unauthorized, or malicious or wilful." *Id.* See also *Ira S. Bushey & Sons, Inc. v. United States,* 398 F.2d 167 (2d Cir.1968).

The Fourth Circuit applied these principles in a sexual harassment context in *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343 (4th Cir.1995). In *Martin,* a post-*Meritor* decision, the issue was whether the corporate employer (Cavalier Hotel) was responsible for the acts of its vice president and general manager, who had sexually harassed one of the employees. Looking to agency princi-

ples, the court reviewed the common law governing an employer's liability for the wrongful acts of an employee that take place within the scope of employment. Under both Virginia law and the Second Restatement, the court held that it is the employer's burden to show that the employee was not acting within the scope of employment when he committed the acts complained of, and that if the evidence leaves the matter in doubt, it is a jury issue. The test, the court held, "is not whether the tortious act itself is a transaction within the ordinary course of the business of the [employer], or within the scope of the [employee's] authority, but whether *the service itself in which the tortious act was done was within the ordinary course of such business or within the scope of such authority.*" *Id.* at 1351 (emphasis added; quotation marks omitted).

In *Martin*, the supervisor's assaults (which included rape, oral and anal sodomy, and forced fellatio) took place in the workplace, during working hours, on an employee whom he had authority to hire, fire, promote, and discipline. There was no question that the assaults were foreseeable; otherwise the company would not have had a policy about sexual harassment in the employee manual. The court concluded that under common law agency principles, the supervisor was acting within the scope of his employment, and the company was answerable for his acts. *Id.* at 1352. In addition, the court found that the supervisor had both actual and apparent authority over the employee, which he used to accomplish the wrongful acts in question. Citing this court's decision in *Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1422 (7th Cir.1986), the Fourth Circuit found that Cavalier Hotel was liable for its manager's actions.

This court came to a similar result in *United States v. Balistrieri*, 981 F.2d 916 (7th Cir.1992), a case alleging that the owner of an apartment building and his rental agent had committed discriminatory rental practices in violation of the Fair Housing Act, 42 U.S.C. §§ 3601–19. The owner argued there that even if the evidence was enough to show that the rental agent had discriminated, there was nothing to link her discrimination to him. In language pertinent to the case before us, the court held:

> In any event, Hurdelbrink was acting as Balistrieri's agent. Her duties as agent were to show apartments and to do the other things—such as quoting rents and stating rental conditions—that go along with that job. Hurdelbrink was acting within the scope of her authority—either actual or apparent—when she committed her discriminatory acts. As we have previously held, in housing discrimination cases, "a principal is liable for the wrongful acts of its agent." *Hamilton v. Svatik*, 779 F.2d 383, 388 (7th Cir.1985); see also *Coates v. Bechtel*, 811 F.2d 1045, 1051 (7th Cir.1987). Therefore, Balistrieri is liable for Hurdelbrink's discrimination, even if he never expressly approved it.

981 F.2d at 930.

 Applying these principles to the case before us, we conclude that the facts on the summary judgment record could support a finding that Slowik was acting within the scope of his employment with Burlington when he harassed Ellerth. As in *Martin*, most of his actions took place in the workplace, during working hours, and they were directed toward an employee over whom he had substantial authority. In some cases they occurred off-premises, but only in the context of business luncheons or work-related travel or—to quote *Martin*—"the service itself in which the tortious act was done was within the ordinary course of business or within the scope of such authority." 48 F.3d at 1351. Nothing ever happened on entirely personal time or circumstances. Slowik made the work environment hostile through the authority Burlington had given him to control Ellerth's work assignments and to influence (at the very least) her hiring and promotion, and his *quid pro quo* demands were (as they almost always will be) directly related to his corporate position. The district court erred in believing that the relevant conduct was the harassment itself and that the harassment somehow needed to serve the employer's purpose before "scope of employment" liability could result. Construing the facts in the light most favorable to Ellerth, Slowik's supervision of Ellerth

and the tasks she performed were plainly for Burlington's benefit; this is enough to make Burlington liable for his actions if he carried out those responsibilities in an improper manner.

 Therefore, we arrive at much the same result as our sister circuits who have concluded that supervisory *quid pro quo* harassment can lead to employer liability, although our rationale differs in some important respects. See *Nichols v. Frank,* 42 F.3d 503, 513–14 (9th Cir.1994) (collecting cases); *Bouton v. BMW of North America, Inc.,* 29 F.3d 103, 106–07 (3d Cir.1994); *Karibian v. Columbia Univ.,* 14 F.3d 773, 777 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 185–86 (6th Cir.), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992); *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989). We believe, in any event, that the term "strict liability" is not well suited to discrimination cases. Strict liability, after all, refers to a tort rule designed to encourage people to exercise greater care when undertaking socially beneficial but abnormally hazardous activities. See W. Page Keeton *et al.,* Prosser and Keeton on the Law of Torts § 75 at 537 (5th ed. 1984 & Supp.1988). Running a corporation may create the potential that employees discriminate on forbidden grounds, but this activity is not "abnormally" hazardous in the sense that blasting, making munitions, and disposing of toxic waste are. Rather, the high incidence of employer liability in *quid pro quo* cases can be explained by the very nature of the harassment. Consistently with *Meritor,* employers are not liable in *quid pro quo* cases because the standard is "strict." Liability follows instead because *quid pro quo* harassment describes a set of facts where the supervisor, as agent, will almost always be acting within the scope of his delegated authority, and the tangible employment benefit that is the "quid" lies within the supervisor's power to give or withhold only because the employer, as principal, entrusted the supervisor with that particular power. As the Supreme Court put it in *Meritor,* referring to the EEOC's position:

where a supervisor exercises the authority actually delegated to him by his employer, by making or threatening to make decisions affecting the employment status of his subordinates, *such actions are properly imputed to the employer whose delegation of authority empowered the supervisor to undertake them.*

477 U.S. at 70, 106 S.Ct. at 2407 (citing to amici briefs of the Solicitor General and EEOC) (emphasis added).

 Thus, if and to the extent that Slowik engaged in acts of sexual harassment of either the *quid pro quo* or hostile environment variety, within the period covered by Ellerth's complaint, Burlington itself may be liable under the principles outlined here. (We note that Ellerth did not appeal the district court's determination on the statute of limitations point.) The fact that Ellerth did not invoke the remedies provided by Burlington's sexual harassment policy is not dispositive, as the Court held in *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408. Under agency law, Burlington's liability for actions of its supervisor taken within the actual or apparent scope of his employment does not depend on whether someone else at the company knew or should have known that Slowik was abusing the authority he had been given. The common law of agency places the responsibility on the employer to monitor the supervisory employees to whom it has entrusted special powers, to ensure that those powers are not misused.

### E.

 It is important to emphasize how the limiting principles found in the law of agency distinguish this outcome from the "automatic" or "absolute" theory of liability rejected by the *Meritor* Court. Because, on remand, some of those principles may also become relevant, we discuss them here. First and most important, the employer may succeed in showing that the supervisor's actions were taken outside the scope of his employment. (These might be actions taken entirely off the premises, where the meetings were not occasioned by the needs of the employer, or where the manner or type of abuse was entirely unforeseeable to the employer.) In that case, section 219(2) of the Second Restatement, set forth earlier, describes the

much narrower circumstances under which a master may be liable for a servant's actions.

■ Subsection (a) of § 219(2) addresses the situation in which the master intended the conduct or consequences of the servant's actions. See Second Restatement § 212 (stating general rule that a person is subject to liability for the consequences of another's conduct which results from his directions if, with knowledge of the conditions, he intends the conduct or its consequences). In this circumstance, the question of "scope of employment" is basically beside the point, because the master has manifested a specific intent that the action occur.

■■ Section 219(2)(b) makes the master liable for the servant's actions outside the scope of employment when the master was negligent or reckless. See *id.* § 213. This theory frequently arises in sexual harassment cases, particularly where co-worker harassment is involved. For these cases, the question whether the employer knew or should have known about the harassing or other discriminatory conduct is central, because it goes to the basic issue of negligence or recklessness. See, *e.g., Zimmerman v. Cook County Sheriff's Dept.,* 96 F.3d 1017, 1018 (7th Cir.1996) ("[t]he liability of an employer for sexual harassment by one nonsupervisory employee of another is not strict. The plaintiff must prove that the employer was negligent in having failed to discover and prevent it"). If negligence is the theory applicable to the case, then the question whether the plaintiff invoked a company's established sexual harassment policy or otherwise gave effective notice to the company is plainly relevant.

■ Section 219(2)(c) provides for liability for actions outside the scope of employment when the agent's conduct violated a non-delegable duty of the master. See also § 214. Such a duty might arise under a contract, or it might arise by operation of law. The Second Restatement gives several examples, including action that is illegal unless it is licensed, highly dangerous activities, and the special duties of occupiers of land.

Although employers plainly have a duty under Title VII to operate a workplace free from discrimination, including sexual harassment, we do not read *Meritor* and *Harris* as holding that this duty is the special kind of non-delegable one referred to in § 214. This would, in effect, be the automatic liability rule that the *Meritor* Court rejected. But see Justin S. Weddle, "Title VII Sexual Harassment: Recognizing an Employer's Non-Delegable Duty To Prevent a Hostile Workplace," 95 Colum.L.Rev. 724 (1995).

Finally, § 219(2)(d) covers situations in which "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." Our sister circuits have read this language two ways. In *Bouton v. BMW of North America, Inc.,* 29 F.3d 103, 108 (3d Cir.1994), the Third Circuit found that this language referred only to the apparent authority theory, albeit by phrasing it in two different ways. The Second Circuit took a different view in *Karibian v. Columbia Univ.,* 14 F.3d 773, 780 (2d Cir.1994), where it held employers absolutely liable under the first clause for sexual harassment enabled by apparent authority and under the second clause for sexual harassment enabled by delegated authority. Both Ellerth and the Equal Employment Opportunity Commission, as amicus curiae, urge us to follow the Second Circuit's approach here, while Burlington argues that the Third Circuit had it right.

In our view, the correct answer lies somewhere between the two. The first clause of § 219(2)(d) plainly implicates the well known apparent authority theory of agency law. Section 8 of the Second Restatement defines "apparent authority" as "the power to affect the legal relations of another person by transactions with third persons, *professedly* as agent for the other, arising from and in accordance with the *other's manifestations to such third persons.*" (Emphasis added.) See also 2A C.J.S. *Agency* § 157a (1972) (apparent authority is "such power that a principal holds his agent out as possessing or permits him to exercise under such circumstances as to preclude a denial of its existence."). In *Faber–Musser Co. v. William E. Dee Clay Mfg. Co.,* 291 Ill. 240, 126 N.E. 186, 188 (1920), the Illinois Supreme Court defined apparent authority as the authority a

reasonably prudent person would naturally suppose, or that which the agent appears to have by reason of his actual authority.

Under the first clause of § 219(2)(d), therefore, the principal will be liable where the agent misrepresented the existence or scope of an agency relation, and it was reasonable under the rules of apparent authority for a third party to believe him. In such cases, the principal is held liable because of manifestations that made it reasonable for a third party to believe that the agent acted with authority. The issue of whether there was apparent authority does not arise on our facts at all. No one doubts that Slowik was a Vice President for Burlington, and thus that he was its agent in some respects.

Section 219(2)(d), clause 2, covers cases where the servant was aided in accomplishing the tort by the existence of the agency relation. On its face, this refers to the powers conferred by an agency relation, as opposed to "apparent authority" to act as an agent at all, which is the way the term is used in the first clause and § 8. Rather than misrepresenting his agency relation, as in the first clause, in these cases the agent misapplies the powers delegated by the principal, which he is able to do because of apparent authority. The language of § 261, to which Comment e of § 219(2)(d) refers, makes this clear: "[a] principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." The employee, by definition in these cases, is acting outside the scope of employment, but the employer is liable nonetheless because, by giving the employee particular powers and holding him out as an agent, the employer enabled the employee to commit a tort under the guise of apparent authority. One of the examples in Comment e to § 219(2)(d) lends further support to this reading. It states that liability will exist in the case of a servant who "may be able to cause harm because of his position as agent, as where a telegraph operator sends false messages purporting to come from third persons." Although the principal is entirely innocent in such cases, liability is based on the fact that the principal placed the agent in a position, undetectable to reasonable third parties, that enabled the tort. See *id.* § 261 cmt. a. In the final analysis, it is the abuse of delegated authority, coupled with the victim's reasonable perception of apparent authority, that forms the basis of liability.

In Ellerth's case, the delegated authority theory of the second clause could come into play if further development of the facts indicates that Slowik was not acting within the scope of his actual authority, but she reasonably believed that he was empowered to take certain actions. Again, this would not require a finding that Burlington created the impression that Slowik was authorized to commit sexual harassment. It could no more do that than it could give him apparent or actual permission to engage in racial discrimination in hiring, or to refuse to accommodate an employee's legitimate religious needs, or to discriminate against the disabled. As in the case of the scope of employment issue discussed above, the § 219(2)(d) apparent scope of authority question relates to the authority Slowik appeared to have as Burlington's agent: for example, could he hire and fire employees at Ellerth's level; could he control work assignments; could he require someone to relocate from Chicago to New York; how extensive a budget did he control? Understood this way, apparent scope of authority would be important here only if Slowik's actual authority over Ellerth's job were less than it appeared to be. If Slowik's exercise of delegated authority led Ellerth to believe (reasonably) that he could cause her to be fired, even if he could not, then conduct outside the scope of his employment might be actionable under the second clause of § 219(2)(d). *Cf. North v. Madison Area Ass'n for Retarded Citizens– Developmental Ctrs.*, 844 F.2d 401, 407 (7th Cir.1988). If, for example, Slowik required Ellerth to attend meetings with him, endure harassing telephone calls, subject herself to unwanted touching, and the like, because he used his delegated authority as Vice President to create the impression that he had plenary power over her employment position, the second clause of § 219(2)(d) would provide a basis for holding Burlington responsible for his actions. See also *Champion v. Nationwide Security, Inc.*, 450 Mich. 702, 545 N.W.2d 596, 601 (1996) (employer liable

where supervisor used his delegated power to place subordinate in situation that facilitated rape).

As is the case with liability for actions within the scope of employment, the existence of a policy forbidding sexual harassment does not alter the employer's liability under § 219(2)(d). Such a policy tells the employee nothing about the breadth of the supervisor's duties and powers within the company, which is the only relevant question, and there is obviously never a case in which a company could confer either actual or apparent authority to violate the law.

The requirement of apparent authority brings an objective element to the analysis that avoids the hazards of both the Second Circuit's interpretation in *Karibian*, which runs the risk of imposing absolute liability on employers for the intentional torts of employees, and the Third Circuit's view in *Bouton*, which too easily excuses employers from making efforts to protect vulnerable subordinates. As we implied in *Baskerville v. Culligan International Co.*, 50 F.3d 428 (7th Cir.1995), when a supervisor's harassing conduct is outside the scope of employment, the facts must show that the plaintiff was reasonable in believing the supervisor acted with authority. If so, then liability would follow under the principles of § 219(2)(d). If not, then the employer will be liable only if it was negligent or reckless. See § 219(2)(b); *Baskerville*, 50 F.3d at 432.

## IV

In summary, we conclude that Ellerth's complaint was broad enough to encompass both *quid pro quo* and hostile work environment sexual harassment. Ellerth's evidence would permit a finding that Slowik's conduct, under the governing agency principles, was undertaken within the scope of his employment with Burlington. She therefore presented enough to withstand Burlington's summary judgment motion. Under this theory, her failure to complain formally under Burlington's sexual harassment policy will not be fatal to her claim. (We make no comment on the relevance of Ellerth's complaints to other Burlington employees and supervisors, which may be pertinent on remand as well.) Policies that make clear the unacceptable nature of sexual harassment and that establish effective systems for its prevention and redress are extremely valuable, both in cases that must proceed on the basis of a negligence theory, and as a healthy dose of preventive medicine. However, as this Court noted in *Baskerville*, supra at 431, when harassment takes the form of an abuse of authority, agency principles will often permit liability even without employer negligence.

The decision of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

## ORDER

### Jan. 28, 1997

The petition for rehearing with suggestion for rehearing en banc in the above-entitled case is **GRANTED**, the panel decision is **VACATED**, and the appeal is restored to the calendar for oral reargument before the full court at a date and time to be announced.